VICTOR M. SHER (SBN 96197)
vic@sheredling.com
MATTHEW K. EDLING (SBN 250940)
matt@sheredling.com
MARTIN D. QUIÑONES (SBN 293318)
marty@sheredling.com
TIMOTHY R. SLOANE (SBN 292864)
tim@sheredling.com
**SHER EDLING LLP**
100 Montgomery St., Suite 1410
San Francisco, CA 94104
Tel:   (628) 231-2500
Fax:   (628) 231-2929

*Attorneys for Plaintiffs ALISU INVESTMENTS, LTD,
and KARGO GROUP GP, LLC*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ALISU INVESTMENTS, LTD. and KARGO GROUP GP, LLC, | Case No. 2:16-CV-00686 MWF (PJWx) |
| Plaintiffs, | Honorable Michael W. Fitzgerald |
| v. | **PLAINTIFFS' OPPOSITION TO DEFENDANTS METAL PRODUCTS ENGINEERING, LUPPE RIDGWAY LUPPEN, AND PAULA LUPPEN'S MOTION FOR PRELIMINARY INJUNCTION** |
| TRIMAS CORPORATION d/b/a/ NI INDUSTRIES, INC., BRADFORD WHITE CORPORATION, LUPPE RIDGWAY LUPPEN, PAULA BUSCH LUPPEN, METAL PRODUCTS ENGINEERING, DEUTSCH/SDL, LTD., RHEEM MANUFACTURING COMPANY, and INFINITY HOLDINGS, LLC, | Date: January 7, 2018 Time: 10:00 AM Judge: Hon. Michael W. Fitzgerald |
| Defendants. | Jury Trial: August 13, 2019 |
| AND ALL COUNTERCLAIMS | |

**TABLE OF CONTENTS**

I.   INTRODUCTION ............................................................................................1

II.  STATEMENT OF RELEVANT FACTS ......................................................2

    a.   Plaintiffs' Site Investigation and Voluntary Cleanup Agreement ......2

    b.   The Soil Windrows at Issue Have Been Monitored by DTSC Throughout 2018, and No Testing Has Shown Any Hazardous Materials in Them Above Screening Levels. ....................................4

    c.   All Identified Hazardous Material Remaining On-Site Are Either Below Ground or Fully Contained Within Wrapped Metal Pipe. .......6

III. ARGUMENT ..................................................................................................8

    a.   Legal Standards ...........................................................................8

    b.   The Law and Facts Do Not "Clearly Favor" Metal Products' Position as to Any of Its Claims—The Opposite Is True. ...................9

       i.    RCRA: There Is No Evidence the Windrows Contain Any Hazardous Waste, or Present an Imminent and Substantial Endangerment to Health or The Environment.....................................9

       ii.   Private Nuisance: Metal Products Has Not Shown That the Windrows Constitute a Private Nuisance. ........................................12

       iii.  Public Nuisance: Metal Products Has Presented No Law or Facts That the Windrows Constitute a Public Nuisance. ...........................13

       iv.   Trespass: Metal Products Has Presented No Law or Facts That Plaintiffs Are Liable for Trespass......................................................14

       v.    Cal. Bus. & Prof. Code § 17200. .........................................................15

    c.   Metal Products Has Not Alleged or Shown That It is Likely to Suffer Irreparable Harm in the Absence of an Injunction. ...............18

    d.   The Balance of Equities Weighs Against Issuing the Requested Injunction. ........................................................................19

    e.   The Public Interest Does Not Support Metal Products' Requested Injunction. ........................................................................20

    f.   The Relief Requested by Defendant is Vague and Overbroad. .........21

IV.  CONCLUSION ............................................................................................23

# TABLE OF AUTHORITIES

**Cases**

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ......................................................8, 18

*Campbell Soup Co. v. ConAgra, Inc.*,
977 F2d 86 (3rd Cir. 1992) ................................................................18

*Earth Island Inst. v. Carlton*,
626 F.3d 462 (9th Cir. 2010) ...............................................................8

*Epicor Software Corp. v. Alternative Tech. Sols., Inc.*,
2013 WL 12130254 (C.D. Cal. May 20, 2013)...........................21, 22

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) ............................................................8, 9

*Isuzu Motors Ltd. v. Consumers Union of U.S., Inc.*,
12 F. Supp. 2d 1035 (C.D. Cal. 1998) ........................................15, 17

*Kornoff v. Kingsburg Cotton Oil Co.*,
45 Cal. 2d 265 (1955) ...................................................................14, 15

*League of Wilderness Defenders/Blue Mountains Biodiversity Project v.
Connaughton*,
752 F3d 755 (9th Cir. 2014) ...............................................................20

*Mangini v. Aerojet-Gen. Corp.*,
230 Cal. App. 3d 1125 (Ct. App. 1991) .................................15, 17, 18

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
571 F.3d 873 (9th Cir. 2009) ................................................................8

*Martin v. Int'l Olympic Comm.*,
740 F.2d 670 (9th Cir. 1984) ...............................................................8

*Matter of Defend H20 v. Town Bd. of the Town of E. Hampton*,
147 F. Supp. 3d 80 (E.D.N.Y. 2015) ...................................................20

*Meghrig v. KFC W., Inc.*,
516 U.S. 479 (1996)............................................................................23

*NLRB v. Express Pub. Co.*,
312 U.S. 426 (1941)............................................................................22

*Perfect 10, Inc. v. Google, Inc.*,
653 F3d 976 (9th Cir. 2011) ...............................................................18

*Price v. U.S. Navy*,
39 F.3d 1011 (9th Cir. 1994) ...........................................................9, 10

*REV 973 LLC v. Mouren-Laurens*,
　2010 WL 383615 (C.D. Cal. Jan. 25, 2010) ................................................. 10, 11

*Stanley v. Univ. of S. California*,
　13 F.3d 1313 (9th Cir. 1994) ............................................................................... 8

*Stormans, Inc. v. Selecky*,
　586 F3d 1109 (9th Cir. 2009) ............................................................................ 20

*United States v. Marine Shale Processors*,
　81 F.3d 1329 (5th Cir. 1996) ............................................................................ 20

*Venuto v. Owens-Corning Fiberglas Corp.*,
　22 Cal. App. 3d 116 (Ct. App. 1971) ............................................................... 13

*Winter v. Natural Res. Def. Council*,
　555 U.S. 7 (2008) ...................................................................................... passim

**Statutes**

42 U.S.C. § 6901 .................................................................................................. 23

42 U.S.C. § 6972 ...................................................................................... 9, 12, 23

Cal. Bus. & Prof. Code § 17200 ............................................................. 15, 16, 18

Cal. Civ. Code § 3479 ......................................................................................... 12

Cal. Health & Safety Code § 41700 .............................................................. 16, 22

**Rules**

Fed. R. Civ. P. 65 ................................................................................................ 21

**Regulations**

22 Cal. Code Reg. § 66261.24 ............................................................................... 2

**Other Authorities**

CACI No. 2000 .................................................................................................... 14

CACI No. 2020 .................................................................................................... 13

CACI No. 2021 .................................................................................................... 12

## I.   INTRODUCTION

Counterclaimants Luppe Ridgway Luppen, Paula Busch Luppen, and Metal Products Engineering (collectively "Metal Products") have moved this Court for a mandatory preliminary injunction ordering Plaintiffs Alisu Investments, Ltd., and Kargo Group GP, LLC ("Plaintiffs"), to immediately remove approximately 9,000 cubic yards of soil and concrete aggregate material situated in five covered windrows at the Property owned by Plaintiffs at 4901 S. Boyle Avenue ("Property"), and/or perform a host of other measures that Metal Products alleges are required by the City of Vernon Code or Ordinances, the California Health & Safety Code, and various South Coast Air Quality Management District ("AQMD") rules. The management of the windrows, and testing of materials within them, is being actively overseen and monitored by both the AQMD and the California Department of Toxic Substances Control ("DTSC") and has been so overseen by those agencies for nearly a year. Contrary to the allegations in Metal Products' Motion, none of the hundreds of soil samples taken from the windrows to date have shown hazardous levels of any substance. Neither AQMD nor DTSC has cited Plaintiffs or their environmental consultants for violation of any rule, statute, or ordinance related to the windrows, at any time.

The relief Metal Products demands would disrupt ongoing regulatory investigations of the windrows and the Property by two agencies, conflict with direct guidance DTSC has given Plaintiffs concerning the management of windrows, dramatically alter the status quo, and cost Plaintiffs potentially hundreds of thousands of dollars. Meanwhile, no data has shown the content of the windrows is hazardous, and there is no evidence that Plaintiffs' conduct violates any law or rule, other than Metal Products' own assertions. Metal Products has not come close to meeting its burden as to any elements necessary to grant a preliminary injunction, and its motion must be denied.

## II.    STATEMENT OF RELEVANT FACTS

### a.    Plaintiffs' Site Investigation and Voluntary Cleanup Agreement

On August 1, 2016, Plaintiff Alisu Investments, Ltd., entered a Voluntary Cleanup Agreement with DTSC, for the investigation and cleanup of volatile organic compounds potentially present in the soil, soil vapor, and groundwater at the Property. *See generally*, Declaration of Martin D. Quiñones ¶2, Ex. 1 (Voluntary Cleanup Agreement) ("Quiñones Decl.").[1] Pursuant to that Agreement, Plaintiff's environmental consultant Environmental Audit, Inc. ("EAI") submitted a Work Plan effectuating the Agreement to DTSC on December 14, 2016, following a site visit, multiple meetings, and written comments from DTSC. *See* Quiñones Decl. ¶3, Ex. 2 at 2 (Responses to DTSC Comments and Supplemental Groundwater, Soil Gas and Former Building 2 Foundation Removal Work Plan). DTSC provided comments on the Work Plan on March 10, 2017. *See* Quiñones ¶4, Ex. 3 (Feb. 28, 2018 Letter from EAI to South Coast Air Quality Management District re: Notice to Comply).

In relevant part, the Work Plan included the removal of a raised concrete foundation slab that underlaid a former building on the Property, and the investigation of features of concern on the foundation such as trenches, sumps, and drainage troughs. *See* Quiñones Decl. ¶3, Ex. 2 at 12–13. At DTSC's recommendation, the Work Plan included testing soil adjacent to all those features of concern for volatile organic compounds; so-called "Title 22 metals,"[2] which include cobalt, barium, lead, nickel, thallium, vanadium, and zinc; hexavalent chromium; perchlorate; hydrocarbons; and PCBs. *Id.* at 8. The Work Plan stated that the features of concern would be removed and tested for contaminants first, followed

---

[1] The Agreement followed a Phase II Environmental Site Assessment submitted to DTSC by EAI on Jul 16, 2015, and a Supplemental Site Assessment submitted on July 19, 2016. *See* Quiñones ¶ 3, Ex. 2 at 2.

[2] "Title 22 Metals" refers to a list of metals at 22 Cal. Code Reg. § 66261.24(a)(2)(A), which if present in waste above certain threshold levels defined in that regulation, renders the waste toxic for purposes of state regulation.

by removal and testing of the foundation slab, with potentially contaminated samples segregated from the rest of slab material and covered. *Id.* at 13. After all features of concern containing potentially hazardous materials were removed from the site, fill material from within the raised footprint of the foundation would be excavated and brought to grade. *Id.* Fill material would then be segregated into stockpiles for sampling. *Id.*

EAI executed the Work Plan items described above between July 17, 2017 through November 3, 2017. *See* Quiñones Decl. ¶4, Ex. 3 at 2. Hundreds of soil samples were tested from soil in and around that various features of concern at the Property, including more than 280 samples for Title 22 metals, 550 samples for volatile organic compounds, and 330 samples for petroleum hydrocarbons. *See* Quiñones Decl. ¶5, Ex. 4 at 76–80 (Supplemental Site Assessment II, October 18, 2018).[3] In relevant part, arsenic, cadmium, cobalt, lead, thallium, petroleum hydrocarbons, and the volatile organic compound perchlorethylene ("PCE") were detected in one or more samples above the relevant regulatory screening level. *Id.* at 78–80.

Between October 12 and October 20, 2017, all excavated soil associated with contaminated features of concern was shipped off-site, with the exception of two small stockpiles discussed in more detail below. Quiñones Decl. ¶4, Ex. 3 at 2. Approximately 160 tons of excavated hazardous waste—i.e., waste that included samples with a hazardous material about the relevant screening level—was shipped to two licensed hazardous waste landfills, and a total of 178 tons of non-hazardous waste was shipped to eight other recycling facilities and landfills. *Id.*; *see also* Quiñones Decl. ¶5, Ex. 4 at 73. Beginning on October 24, 2017, after all remnant

---

[3] The complete Supplemental Site Assessment II, including all tables, appendices, and figures, is more than 4,800 pages long, and 385 megabytes in size in electronic form. As such, only the text portion of that report has been included in Ex. 4 to the Quiñones Declaration, with specific supporting documents included separately where appropriate.

concrete structures and features had been removed and investigated, EAI began constructing the five windrow stockpiles out of soil within the perimeter of the former building's elevated foundation. Quiñones Decl. ¶5, Ex. 4 at 71–72; *see also* Quiñones Decl. ¶10, Ex. 9 (Figure 3 to Supplemental Site Assessment II, Site Plan All Depicting Features of Concern and Sampling Locations) (indicating windrow locations with respect to Property and features of concern).

> **b.   The Soil Windrows at Issue Have Been Monitored by DTSC Throughout 2018, and No Testing Has Shown Any Hazardous Materials in Them Above Screening Levels.**

The 9,000 cubic yards of soil and concrete material contained in the windrows had been extensively tested prior to being gathered into the windrows. *Id.* at 8, 71. No testing of any soil placed in any of the windrows showed or has shown any contaminant above a relevant screening level. More than 180 soil samples were collected from soil within the footprint of the former building prior to the generation of the windrow stockpiles. Quiñones Decl. ¶6, Ex. 5 at 5–6 (June 29, 2018 letter to DTSC from EAI). As stated above, each windrow was generated after all encountered features of concern had been discovered and assessed, and after soil sample results indicated no hazardous substances above respective screening limits. *Id.* at 6, 9. An additional twenty-four samples were taken from the windrows after they were constructed, and analyzed for volatile organic compounds, petroleum hydrocarbons, Title 22 metals, hexavalent chromium, and cyanide—no contaminant was present in any of those samples above a relevant screening level. *Id.* at 6. On or about February 24, 2018, EAI covered the windrows with heavy commercial-grade plastic sheeting, secured by sandbags, which have remained through the present. *See* Declaration of Steve Bright, ¶8. EAI staff has visited the Property at twice per week since February 2018 to observe the stockpiles and their coverings, and replace sheeting that has become dislodged, and at least five times per week since October, 2018. *See* Declaration of Steve Bright, ¶9.

Sampling and management of the windrow stockpiles has been, and continues to be, under active DTSC oversight throughout 2018, including developments since the filing of Metal Products' Motion. On February 22, 2018, EAI received a Notice to Comply from the AQMD directing EAI to provide information regarding the construction and testing of the windrows, and supplemental information concerning disposal of hazardous materials off-site, to which EAI responded on February 28, also providing a copy to DTSC. *See generally* Quiñones Decl. ¶7, Ex. 6. On May 29, 2018, DTSC provided additional comment on EAI's response and requested additional information, to which EAI responded on June 29, 2018. *See* Quiñones Decl. ¶6, Ex. 5. On September 18, 2018, DTSC requested EAI submit a workplan to further characterize and sample the windrows, which EAI provided on September 25. *See* Quiñones Decl. ¶7, Ex. 6 (Windrow Characterization Field Sampling Work Plan). In addition to details regarding sampling the windrows, the Work Plan stated that "[t]he use of a soil stabilizer/dust suppressant . . . is being evaluated to potentially replace the plastic sheeting presently being used on the windrows" as a primary dust control method, and that EAI would notify DTSC and AQMD regarding any such change to dust control methods prior to executing the change. *Id.* at 5, § 2.5. On December 10, 2018—the day Metal Products filed its motion—DTSC approved the Work Plan, and sampling of the windrows was conducted pursuant to that Work Plan on December 12, and December 13, 2018, with representatives from both DTSC and AQMD present. *See* Quiñones Decl. ¶8, Ex. 7 (December 14 Email from Folashade Simpson to Lisa Trepanier); Declaration of Steve Bright, ¶10. Results of that sampling are pending, and anticipated within the next thirty days. *See* Declaration of Steve Bright, ¶10.

If the windrows are ultimately demonstrated to contain clean fill, Plaintiffs propose to use the windrow material to raise the foundation of any new building constructed on the site to 36 inches above the surrounding grade, as was the case with the former building foundation at the Property. *See* Quiñones Decl. ¶7, Ex. 6 at

7 (February 28 Letter from EAI to AQMD re: Notice to Comply). On or about November 8, 2018, EAI requested a cost estimate from a waste contractor for the removal of the windrows if they are unfit for reuse at the property, and determined that it would cost approximately $526,000 to remove the windrows, assuming they contain non-hazardous waste. *See* Declaration of Steve Bright, ¶12.

### c. All Identified Hazardous Material Remaining On-Site Are Either Below Ground or Fully Contained Within Wrapped Metal Pipe.

Metal Products' Motion states that "soil contaminated with the remaining hazardous substances remains on site" in several locations. Mot. at 4. While technically true, the statement requires clarification. In brief, none of the contaminated soil remaining on-site is exposed to the air, or stored in the windrows that Metal Products alleges are causing dust to spread off the Property.

**TPH-D**: The Motion avers that soil containing hydrocarbons as diesel "remains on site" at the property. Mot. at 4. That statement apparently refers the soil sample labeled "Vault 20 Bottom12'," in which TPH-D was found above screening levels, and which "remains on-site in-place." Quiñones Decl. ¶5, Ex. 4 at 76–77. Importantly, however, as the "12'" suffix on the sample name indicates, that sample was taken from "beneath the former location" of a feature of concern referred to as Vault 20, "following removal of the vault," at a depth of twelve feet below ground surface. *Id.* at 76–77; Declaration of Steve Bright, ¶11. Thus, the statement in EAI's Supplemental Site Assessment that "[t]his soil remains on-site in-place" means that the contaminated soil remains *twelve feet underground*, and cannot be contributing to dust allegedly traveling off the Property.

**PCE**: The Motion similarly avers that "[s]oil containing PCE remains on site, some in a stockpile and some in other areas." Mot. at 4. The "stockpile" apparently refers to soil stockpiles labeled "Vault 12" and "Vault 28," which were removed from the Property on November 2, 2018, with representatives from DTSC present to oversee the removal. *See* Quiñones Decl. ¶9, Ex. 8 at 1 (November 13, 2018 Email

from Folashade Simpson to Lisa Trepanier). The "other areas" apparently refer again to soil associated with the "Vault 20 Bottom12" sample, which, as discussed above, rests twelve feet below ground.

**Arsenic**: As stated in the Motion, soil containing arsenic above screening levels "remains on-site beneath Windrow 1." Quiñones Decl. ¶5, Ex. 4 at 79–80. As that language indicates, soil associated with "sample Drain Trough3-1d0.3," from which arsenic was encountered, remains at the Property and the window labeled Windrow 1 sits on top of it. *See* Quiñones Decl. ¶5, Ex. 4 at 79–80; Quiñones Decl. ¶10, Ex. 9. Any contaminants in soil associated with the sampling location Drain Trough3-1 are presently buried, and not exposed to the atmosphere; they cannot escape to the ambient air.

**Cobalt**: Finally, the motion avers that soil containing cobalt "remains on site." Mot. at 4. The only soil containing cobalt that remains on-site is soil associated with "sample Trench Pipe 13 Contents." Quiñones Decl. ¶5, Ex. 4 at 79–80. All soil associated with that the Trench Pipe 13 Contents samples are entirely encased in a "short segment of pipe" that is "wrapped in heavy commercial grade plastic sheeting" at the Property. *Id.* at 80. It is not contained in any of the soil windrows and is not exposed to the environment.

In summary, EAI is continuing to diligently test and analyze soil in the windrows, which Plaintiffs hope to reuse on-site rather than pay to ship off-site. No testing conducted to date anywhere, in any of the windrows, has shown hazardous substances above a level where action is required by law or regulation. DTSC and AQMD have been actively involved in the monitoring and overseeing management and testing of the windrows for nearly a year, and have not issued any citations for violations of any law, rule, or ordinance.

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PRELIMINARY INJUNCTION; CASE NO. 2:16-CV-00686 MWF (PJWX)**

## III.   ARGUMENT

### a.   Legal Standards

A preliminary injunction "'is a matter of equitable discretion' and is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010) (quoting *Winter v. Natural Res. Def. Council,* 555 U.S. 7, 22, 32 (2008)). To "face [the] difficult task [of] proving that they are entitled to this extraordinary remedy," a party moving for a preliminary injunction "must demonstrate (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest." *Id.* (citations omitted). In general under this analysis, "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

When a party seeks a so-called "mandatory injunction" that would order the responding party "to take affirmative action"—as opposed to a "prohibitory injunction" that would prohibit the responding party from taking certain action—the movant's burden "is doubly demanding." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015); *see also Stanley v. Univ. of S. California*, 13 F.3d 1313, 1320 (9th Cir. 1994) ("A mandatory injunction goes well beyond simply maintaining the status quo *pendente lite* and is particularly disfavored." (citation and punctuation omitted)); *Martin v. Int'l Olympic Comm.*, 740 F.2d 670, 675 (9th Cir. 1984) ("[Where] a party seeks mandatory preliminary relief . . . courts should be extremely cautious about issuing a preliminary injunction."). "In general, mandatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d

873, 879 (9th Cir. 2009). In particular, a party seeking a mandatory injunction "must establish that the law and facts *clearly favor* her position, not simply that she is likely to succeed." *Garcia*, 786 F.3d at 740.

### b. The Law and Facts Do Not "Clearly Favor" Metal Products' Position as to Any of Its Claims—The Opposite Is True.

Regardless of what formulation of the "sliding scale" for a preliminary injunction is applied, to obtain such relief, a movant must show that it is "likely" to prevail on the merits. *Winter*, 555 U.S. at 20. This is the "the first and most important factor" in the test for a preliminary injunction. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). Because it is a threshold issue, if the movant fails to show likelihood of success, the court generally need not consider the other three *Winters* elements. *Id.*

### i. RCRA: There Is No Evidence the Windrows Contain Any Hazardous Waste, or Present an Imminent and Substantial Endangerment to Health or The Environment.

Metal Products' claim for an imminent and substantial endangerment under RCRA requires it to prove that (1) Plaintiffs are past or present generators of solid or hazardous wastes; (2) Plaintiffs contributed or are contributing to the past or present handling, storage, or disposal of any solid or hazardous waste; and (3) such handling, storage, or disposal "may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). To establish an "imminent and substantial endangerment," "there must be a threat which is present *now*," and the "endangerment must be substantial or serious, and there must be some necessity for the action." *Price v. U.S. Navy*, 39 F.3d 1011, 1019 (9th Cir. 1994) (emphasis in original) (affirming dismissal where the plaintiff did not establish that waste under concrete slab posed a present, substantial threat).

Metal Products offers no proof whatsoever that any dust allegedly spreading from the windrows on that Property presents an imminent and substantial

endangerment to health and the environment, because there is no evidence that either the dust on Metal Products' property, or the windrows where the dust allegedly originated, contains hazardous waste. The hundreds of samples taken from the windrow soil to date have not shown any hazardous substance above a screening level. *See* Part II.b, *supra*. Metal Products has presented no evidence that it has tested the fugitive dust that on its property to ascertain its contents or confirm its origin, nor any expert declaration or other expert evidence purporting to show that the windrows contain hazardous substances, nor any similar evidence that soil from locations associated with any hazardous substance are likely to escape through the air or otherwise. Metal Products is not likely to carry its burden under RCRA of showing that dust escaping from the Property that a "substantial and serious" threat to health of the environment is "present *now*." *Price*, 39 F.3d at 1019.

Comparing Metal Products' evidence to that in *REV 973 LLC v. Mouren-Laurens*, No. CV 98-10690 AHM (EX), 2010 WL 383615 (C.D. Cal. Jan. 25, 2010), is instructive. There, as part of a "long and storied" dispute involving contaminated parcels in Compton, California, a group of moving defendants sought, in relevant part, an injunction ordering a group of responding defendants to drain and remove a buried waste oil container that was allegedly leaking into the ground. *Id.* at *1. The moving parties presented expert declarations and accompanying test results showing that sludge and water in the container had hazardous levels of volatile organic compounds and hydrocarbons, that those same chemicals were detected in soil surrounding the container, and that the water level inside the container had dropped over time at a rate consistent with a leak from the container to the environment, all of which the court found the responding defendants had failed to refute. *Id.* at *1–2, *4–5. On that record, the court entered a narrow injunction ordering the responding defendants to drain the waste oil container, remove all sludge at the bottom of the container, dispose of the drained water and sludge, and either seal, fill, or remove the container by a specific date. *Id.* at *8.

Here, Metal Products has not presented any expert or scientific evidence purporting to show that the windrows contain any hazardous substances, or that such substances present any endangerment to health or the environment. Metal Products' only evidence is the personal observations of Defendant Luppe Ridgway Luppen and inferences drawn from them, and photographs taken by Mr. Luppen. For example, Metal Products argues that their property is "directly north, and downwind of" Plaintiffs' Property, and thus presumably more susceptible to dust spreading to them through the air. Mot. at 4. The only evidence Metal Products provides to show that their property is downwind of Plaintiff's property, however, is the statement in Mr. Luppen's declaration: "The Luppen Property is downwind of the Site." Declaration of Luppe Luppen, ¶4, Dkt. 219-1 (December 10, 2018). This may prove true, but Metal Products provides no measurements, data, or other evidence in support of Mr. Luppen's statement. Similarly, Mr. Luppen declares that he has "observed on numerous occasions dirt and dust blowing" from the Property, "seen a noticeable accumulation of dust and pieces of plastic sheeting" on the parking lot and sidewalk of Metal Products' property, that on or about March 15, 2018, Metal Products' "HVAC system was impregnated with an abnormal accumulation of dust and dirt necessitating additional service calls and repairs," and that on October 18, 2018, he experienced a burning sensation in his eyes after cleaning pieces of plastic from the Metal Products parking lot that persisted for two days. *Id.* at ¶¶6, 15, 40. Mr. Luppen attaches still photographs taken by himself in support of those statements, along with a letter he wrote to AQMD stating his concerns about the dust he observed. *Id.* at Ex. 1–23. None of these submissions show that the windrows present endanger health or the environment—importantly, none of this evidence, even if credited, shows that any RCRA hazardous substance has spread or will likely spread off the Property, or even if contained in the windrows. The only scientific data Metal Products cites are reports generated by EAI itself. *See* Declaration of Lisa Dearden Trepanier, ¶¶3, 4, 6 & Exs. 24, 25, 27, Dkt. 219-4 (Dec. 10, 2018). As

explained above, do not show hazardous materials are present in the windrows or any other area where they could escape to the environment, let alone that there is "imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). Mr. Luppens' observations and photographs, unsupported by any expert opinion and contradicted by the available scientific data, are insufficient to show that the law and facts "clearly favor" Metal Products' RCRA claim.

### ii. Private Nuisance: Metal Products Has Not Shown That the Windrows Constitute a Private Nuisance.

To establish a private nuisance, Metal Products must demonstrate (1) the Luppens own the property at issue; (2) Plaintiffs created a condition that is harmful to health; offensive to the senses; and/or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of property; (3) the condition interferes with the Luppens' use or enjoyment of their land; (4) the Luppens did not consent to Plaintiffs' conduct; (5) an ordinary person would be reasonably annoyed or disturbed by Plaintiffs' conduct; (6) the Luppens are harmed; (7) Plaintiffs' conduct was a substantial factor in causing the Luppens' harm; and (8) the seriousness of the harm outweighs the public benefit of Plaintiffs' conduct. CACI No. 2021; California Civil Code § 3479.

Metal Products lists these elements with specificity in its Motion, but concludes without analysis that a nuisance exists on its property; it in no way demonstrates that it is likely to prevail on this claim. Mot. at 14. As noted above, the only evidence in support of its assertion that substantial dust is spreading from the Property to Metal Products' property are Mr. Luppen's observations and several still photographs. *See* Part III.b.i, *supra*. Metal Products offers no evidence quantifying the dust and plastic it alleges has spread to its property, confirming the source of the dust and plastic (and that in turn Plaintiffs' conduct was a substantial factor in the alleged harms), quantifying the degree of interference it alleges the dust and plastic have caused to its enjoyment and use of the property, or demonstrating that the dust

would annoy or disturb a reasonable person. Metal Products further offers no evidence that dust on its property poses a health hazard, and all scientific data gathered to date shows that it does not. Metal Products further asserts, again without analysis or support, that "[t]here is no public benefit to Plaintiffs' conduct," but ignores that analysis and management of the windrows are part of an environmental investigation and remediation process that has been under DTSC oversight for more than two years, directly benefitting the public by identifying and remediating contaminated soil, soil gas, and groundwater at the Property. As just one example, EAI removed hundreds of tons of contaminated soil from the property before the windrows were constructed, and the windrows are currently undergoing another round of sampling and testing under DTSC and AQMD oversight to again confirm they do not contain hazardous substances. *See* Part II.b *supra.* In short, the facts and law do not clearly support Metal Products' position.

### iii.   Public Nuisance: Metal Products Has Presented No Law or Facts That the Windrows Constitute a Public Nuisance.

Metal Products fails to demonstrate that it is likely to establish all elements of public nuisance, which are: (1) Plaintiffs by acting and/or failing to act, created a condition that was harmful to health; offensive to the senses; an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property; (2) the condition affects a substantial number of people at the same time; (3) an ordinary person would be reasonably annoyed or disturbed by the condition; (4) the seriousness of the harm outweighs the social utility of Plaintiffs' conduct; (5) Metal Products Parties did not consent to Plaintiffs' conduct; . . . and (7) Plaintiffs' conduct was a substantial factor in causing Metal Products Parties' harm. CACI No. 2020. A public nuisance is "an interference with the rights of the community at large." *Venuto v. Owens-Corning Fiberglas Corp.*, 22 Cal. App. 3d 116, 124 (Ct. App. 1971) (internal citation omitted).

Metal Products' discussion of the its likelihood of prevailing on this claim is limited to one element: a suggestion that the condition affects a substantial number of people at the same time, or the community at large, with the bald assertion that the "whole neighborhood . . . is suffering" because Plaintiffs are allegedly "allowing dust from their property to blow throughout the neighborhood." Mot. at 15. Metal Products does not define the neighborhood, quantify the amount of dust or where it has spread, or otherwise show that a substantial number of people are affected by fugitive dust. As with its private nuisance claim, Metal Products fails to establish that the source of the dust; that the dust is harmful, offensive, or annoying; that ordinary persons would be reasonably annoyed or disturbed by the dust; and that the harm posed by fugitive dust is so serious as to outweigh the social utility of remediating the Property. Metal Products fails to argue, let alone demonstrate, that the law and facts clearly favor its success on its public nuisance claim.

### iv. Trespass: Metal Products Has Presented No Law or Facts That Plaintiffs Are Liable for Trespass.

Metal Products fails to demonstrate that it will prevail on the merits of its trespass claim, which requires it to show that (1) Metal Products Parties own, lease, or occupy the Luppen Property; (2) Plaintiffs recklessly or negligently caused dirt and dust to enter the Luppen Property; (3) Metal Products Parties did not give permission; (4) Metal Products Parties were harmed; and (5) Plaintiffs' conduct was a substantial factor in causing Metal Products Parties' harm. CACI No. 2000.

Metal Products' discussion of their trespass claim is limited to a citation to *Kornoff v. Kingsburg Cotton Oil Co.*, 45 Cal. 2d 265, 273 (1955), for the implied holding that dust entering the property of another constitutes trespass, *per se*. But as an initial matter, *Kornoff* does not so hold. That case specifically considered whether a trespass claimant may recovery damages for annoyance and discomfort absent physical injury. *See id.* at 275. The plaintiff there was still required to prove a cognizable harm, which it did by showing that its yard, windows, and furniture were

all covered with a thick coating of dust, lint, and ginning waste from the defendant's ginning operation. *Id.* at 273. Here, Metal Products does not analyze how its alleged annoyance and discomfort attributable to dust on their property rise to the level of a cognizable harm, quantify the dust it alleges is present, or properly attribute the dust to the Property. *See* Mot. at 16. Indeed, in its analysis of its likelihood of prevailing on that claim, it does not even discuss harms arising from the trespass.[4] *Id.* Metal Products does not discuss or attempt to show that Plaintiffs' conduct was negligent or reckless—nor can it, because DTSC and AQMD have overseen and continue to oversee Plaintiffs' management and testing of the windrows. Finally, Metal Products again does not quantify the amount of dust allegedly reaching its property or offer any evidence of its source other than Mr. Luppen's observations, or otherwise make any showing that Plaintiffs' conduct is a substantial factor in their alleged injuries. Again, the facts and law do not clearly support Metal Products' position.

### v.   Cal. Bus. & Prof. Code § 17200.

A claim for a violation of California Business and Professions Code section 17200 requires that Metal Products Parties show an "unlawful, unfair or fraudulent business practice" which is "ongoing conduct." *Mangini v. Aerojet-Gen. Corp.*, 230 Cal. App. 3d 1125, 1155–56 (Ct. App. 1991). First, Metal Products has not established that the conduct it seeks to enjoin, namely managing the soil windrows under DTSC and AQMD oversight, constitutes a "business practice," which is always a case-specific question of fact. *Isuzu Motors Ltd. v. Consumers Union of*

---

[4] To the extent Metal Products' factual statement describes possible harms from the alleged trespass, it does not tie those harms to its use and enjoyment of its land. As noted above, Metals Products does not demonstrate that some or all of the dust that alleged clogged its HVAC system or caused Mr. Luppen's eye irritation came from the Property; and the alleged dust piles on the railroad tracks between Metal Products' and Plaintiffs' properties cannot be the subject of a trespass claim since Metal Products has no property interest in them. *See* Mot. at 5.

*U.S., Inc.*, 12 F. Supp. 2d 1035, 1048 (C.D. Cal. 1998). Moreover, Metal Products appears to rely on the "unlawful" prong of § 17200, *see* Mot. at 16, but fails to establish that Plaintiffs have violated any law, as discussed below. As such, it fails to show it is likely to prevail on its § 17200 claim.

Looking to the various legal provisions Metal Products alleges have been violated, it is plain that the law and facts do not clearly favor their position. First, as discussed above, no data shows that the windrows contain hazardous substances and Metal Products has not presented any evidence otherwise, and Metal Products has not quantified or confirmed the source of the dust allegedly moving to its property. *See* Part II.b, *supra*. As such, Metal Products cannot on this record establish that Plaintiffs have "throw[n], place[d], scatter[ed] . . . *contaminated dirt* in, upon, or below the surface of any premises, highway, public street, public place . . . or on the premises of another" in violation of City of Vernon Code of Ordinances § 12.18 (emphasis added), or the nearly identical provision at Cal. Health & Safety Code § 41700.[5] At a minimum, the law and facts do not "clearly support" that such violations has occurred or is occurring.

Second, Metal Products has not established violations of the AQMD Rules at issue—not least of all because AQMD is overseeing the testing and management of the windrows and has not cited or warned EAI or Plaintiffs that they are in violation of any AQMD rule. Rule 402 states the general prohibition against allowing air contaminants to escape from any source in quantities "which cause injury, detriment, nuisance, or annoyance to any considerable number of persons or to the public," or endanger public health, or which cause or naturally would cause injury or damage

---

[5] "[A] person shall not discharge from any source whatsoever quantities of *air contaminants* or other material that cause injury, detriment, nuisance, or annoyance to any considerable number of persons or to the public, or that endanger the comfort, repose, health, or safety of any of those persons or the public, or that cause, or have a natural tendency to cause, injury or damage to business or property." Cal. Health & Safety Code § 41700(a) (emphasis added).

to business or property." AQMD Rule 402. For the reasons already discussed, Metal Products has made no showing that dust is in fact spreading from the Property to affect "any considerable number of persons or the public," that the soil in the windrows at the Property contains any air contaminants, or that any condition on the Property is otherwise a nuisance. Rule 403 provides standards for measuring and preventing the dissemination of fugitive dust from "any activity or man-made condition capable of generating fugitive dust," including any "open storage pile," and provides instructions for best methods to control dust at those sites. *See* AQMD Rule 403(b), (c)(22). As noted above, AQMD and DTSC have been jointly involved in managing the windrows since February 2018, and have not cited EAI or Plaintiffs for any violations of Rule 403 or suggested that a citation is forthcoming. Importantly, EAI stated in its September 25 Work Plan that it was evaluating the use of soil stabilizer/dust suppressant materials to control windrow dust rather than the plastic tarps currently in place, and DTSC approved the workplan on December 10. *See* Part II.b, *supra*. Representatives of both DTSC and AQMD have been present during sampling of the windrows, *see id.*, and at no time have indicated that EAI's dust control measures are inadequate. In sum, the agency best qualified to interpret and apply AQMD Rule 403—the AQMD itself—has not challenged Plaintiffs' dust control at the windrows.

As for AQMD Rule 1466, that rule applies to "any owner or operator conducting earth-moving activities of soil with applicable toxic air contaminant(s)." Rule 1466(b)(1). "Earth-moving activities" is in turn defined as "any activity . . . where soil with applicable toxic air contaminant(s) are being moved or uncovered," including "excavating, grading, earth cutting and filling operations, loading or unloading, and adding to or removing from stockpiles." Rule 1466(c)(7). The rule expressly does not apply to "[r]emoval of soil for sampling purposes." *Id.* at 1466(b)(2)(B). Metal Products has not shown that Rule 1466 applies to the windrows for multiple reasons: First, again, no testing has shown and "toxic air contaminants"

are present in the windrows or otherwise exposed to air on the Property. *See* Part II.b, *supra*. Second, Plaintiffs and EAI are not conducting any earth-moving activities as defined under Rule 1466(c)(7), as the windrows are already in place and have not been excavated, graded, or otherwise moved since November 2017. *See* Quiñones Decl. ¶6, Ex. 5 at 3. The Rule facially does not apply to the stationary covered windrows. Third, the windrow sampling conducted on December 12 and 13 is expressly excluded from the Rule's scope because it is "[r]emoval of soil for sampling purposes." *Id.* at 1466(b)(2)(B). AQMD and DTSC representatives were present, moreover, during that sampling. *See* Quiñones Decl. ¶8, Ex. 7. The law and facts do not clearly favor Metal Products' position that Plaintiffs have violated Rule 1466, or any of the statutes, ordinances, or rules on which Metal Products relies in support of its § 17200 claim.

### c.   Metal Products Has Not Alleged or Shown That It is Likely to Suffer Irreparable Harm in the Absence of an Injunction.

Metal Products must demonstrate that it will *likely* suffer irreparable harm in the absence of an injunction. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008); *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). This element requires the movant to demonstrate harm which "cannot be redressed by a legal or an equitable remedy following a trial. The preliminary injunction must be the *only way* of protecting the plaintiff from harm." *Campbell Soup Co. v. ConAgra, Inc.*, 977 F2d 86, 91 (3rd Cir. 1992) (emphasis in original). In addition, Metal Products must show a "'sufficient causal connection' between the alleged injury and the conduct sought to be enjoined such that the injunction would effectively minimize the risk of injury." *Perfect 10, Inc. v. Google, Inc.,* 653 F3d 976, 982 (9th Cir. 2011).

Metal Products does not even broach the "irreparable harm" element in its papers, let alone carry its burden to demonstrate such a harm. Absent even a discussion of this prerequisite to a preliminary injunction, no such injunction may

issue. And even if it had discussed this element in its Argument, none of the unsubstantiated harms Metal Products posits in its factual statement, *see* Mot. at 5, would rise to the level of "irreparable." Each of those alleged harms—damaged HVAC equipment, mental anguish, and the presence of litter—are and traditionally redressable with monetary damages. Metal Products proffered no evidence other than Mr. Luppen's personal observations that the dust causing it problems originated at the Property, and not from some other source in the heavily industrialized neighborhood where it is located. It therefore fails to establish the "sufficient causal connection" between Plaintiffs' conduct and its harms. Simply put, Metal Products has not carried its burden to establish the irreparability of its harms, and therefore an injunction is improper.

### d. The Balance of Equities Weighs Against Issuing the Requested Injunction.

A court considering a preliminary injunction "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Here, the harm Metal Products alleges include 1) unquantified increased costs to maintain its air conditioning system which allegedly becomes clogged with dust and debris, 2) a burning sensation in Mr. Luppen's eyes that lingered for several days and which he attributes to dust from the Property, 3) "emotional distress and mental anguish," "extrem[e] upset," and "worry" that Mr. and Mrs. Luppen have experienced concerning the health and environmental consequences they believe they may suffer from being exposed to the dust. Mot. at 16–17. Metal Products may ultimately be able to prove and quantify these harms, on the current record they are wholly speculative and unquantified.

Plaintiffs, by contrast, would likely be required to pay an estimated $526,000 to remove the 9,000 cubic yards of windrow material if an injunction issues, assuming the windrows do *not* contain hazardous material. *See* Declaration of Steve

Bright, ¶12. Removing the windrows would, moreover, prevent Plaintiffs from reusing the windrow material as fill on-site in the event testing confirms they are non-hazardous, and would upend the cooperative process EAI and Plaintiffs have been engaged in with AQMD for more than ten months, and with DTSC for more than two years. The measurable, discreet harms Plaintiffs will suffer if the injunction issues unnecessarily outweigh the speculative harms Metal Products allege. *See Matter of Defend H20 v. Town Bd. of the Town of E. Hampton*, 147 F. Supp. 3d 80, 105 (E.D.N.Y. 2015) (balance of equities weighed heavily against granting injunction to halt Army Corps or Engineers sand dune project where community group plaintiffs showed "little more than the possibility" that the project would harm community beach in Montauk, New York, and Army Corps showed it would incur at least $1.1 million in payments to contractors and costs for equipment removal if injunction issued).

### e. The Public Interest Does Not Support Metal Products' Requested Injunction.

Metal Products' requested injunction must be in the public interest. *Winter*, 555 U.S. at 20. The "public interest" inquiry generally addresses the impact upon nonparties of granting or withholding injunctive relief. *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F3d 755, 766 (9th Cir. 2014). Where an injunction's reach is narrow and affects only the parties with no impact on nonparties, "the public interest will be at most a neutral factor in the analysis rather than one that favors granting or denying the preliminary injunction." *Stormans, Inc. v. Selecky*, 586 F3d 1109, 1139 (9th Cir. 2009) (internal quotes and brackets omitted). In weighing the the public interest factor in a case involving a sovereign state, courts afford substantial deference to "the political branches in identifying and protecting the public interest." *See United States v. Marine Shale Processors*, 81 F.3d 1329, 1359 (5th Cir. 1996).

Here, Metal Products provides no analysis whatsoever as to whether or why granting its requested injunction will serve the public interest. This is likely because it cannot demonstrate that the injunction will affect anyone in the public other than Metal Products and Plaintiffs, as it has not clearly shown that dust from the Property is either injurious or affecting any other property in Vernon. At best, the public interest is therefore a neutral factor in determining whether to grant the injunction.

Moreover, Plaintiffs' allegedly harmful conduct is being conducted under a voluntary cleanup agreement with DTSC, with additional AQMD oversight. Both are public agencies of the State of California that exist to protect the public interest in the environment. The requested injunction would compel Plaintiffs to deviate from the course of conduct they have taken under the aegis of those agencies by preemptively removing windrows. But such an order would actually harm the public interest and override the agencies' considered plan for remediating the Property. The Court should not order an injunction that could bear directly on and deviate from the agencies' remediation plan. Requiring such actions is a disservice to the public's interest in orderly environmental remediation overseen by expert agencies.

### f.   The Relief Requested by Defendant is Vague and Overbroad.

The order Metal Products asks the Court to issue would violate the Federal Rules of Civil Procedure because the relief it seeks is impermissibly vague, and overbroad. "Every order granting an injunction must . . . state its terms specifically; and . . . describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(B), (C). For that reason, "[a]n order that essentially requires the defendant to 'obey the law' is unnecessary and impermissibly broad." *Epicor Software Corp. v. Alternative Tech. Sols., Inc.*, No. SACV1300448CJCRNBX, 2013 WL 12130254, at *2 (C.D. Cal. May 20, 2013) (denying temporary restraining that would have required defendant's employees to preserve and not from disseminate "proprietary

information" learned at a conference where "information" subject to order was not specifically described, and attending employees already had duty to preserve any proprietary information relevant to the litigation); *NLRB v. Express Pub. Co.*, 312 U.S. 426, 435–36 (1941) ("[T]he mere fact that a court has found that a defendant has committed an act in violation of a statute does not justify an injunction broadly to obey the statute.").

Here, even apart from the merits of whether *any* injunction should issue, all the relief Metal Products seeks would order Plaintiffs to comply with state, federal, and municipal law, nothing more.[6] The Proposed Order submitted by Metal Products lists eight items to be ordered. *See* Proposed Order, Dkt. 219-5 at 2 (Dec. 10, 2018). The second through sixth items would, in their entirety, order Plaintiffs to "comply with" City of Vernon Code of Ordinances § 12.18, California Health & Safety Code § 41700, and three AQMD Rules. *See id.* Plaintiffs are already required to "comply with" those rules, ordinances, and laws, and even if Plaintiffs were violating them— and they are not—the requested injunction ordering Plaintiffs "to 'obey the law' is unnecessary and impermissibly broad." *See Epicor Software Corp.*, No. SACV1300448CJCRNBX, 2013 WL 12130254, at *2. Similarly, items seven and eight would respectively order Plaintiffs to "abate the nuisance at 4901 S. Boyle Avenue" and "cease trespassing onto 3050 Leonis Boulevard." Proposed Order, Dkt. 219-5 at 2. It does not define the nuisance to be abated or how it should be abated, nor how Plaintiffs are trespassing or how the trespassing shall cease. Presumably, the requested relief is that Plaintiffs will completely remove the windrows, and/or perform the various measures that Metal Products contends are required by various AQMD rules. As argued by Metal Products, however, and as drafted in the Proposed Order that Metal Products submitted, there is no way for Plaintiffs to determine whether they have satisfied the injunction or are in contempt of court.

---

[6] Metal Products in fact states in its Motion that "the burden the order would impose on Plaintiffs . . . is merely to comply with the law." Mot. at 17.

The most detailed item listed in Metal Products' Proposed Order would command Plaintiffs to "clean up and properly dispose of the solid waste and/or hazardous waste" on the Property, "under 42 U.S.C. §6901, *et seq.* ('RCRA')." Proposed Order at 2. But this, too, would merely command Plaintiffs to comply with the law, with no specifics regarding what needs to be "cleaned up" or "properly disposed of," or how those requirements—already imposed by RCRA—should be accomplished.[7] Metal Products' Motion suggests that the focus of the RCRA-related injunction would be removal or other management of "TPH-D, PCE, arsenic, and cobalt," that might reach Metal Products' property "through the air" in soil dust from the windrow stockpiles. As discussed above, no TPH-D, PCE, arsenic, or cobalt has been detected in any of the windrows, and all of the soil associated with positive test results for TPH-D, PCE, arsenic, or cobalt at the Property is either underground or secured within a section of pipe wrapped in plastic sheeting. *See* Part II.c, *supra*. Neither Metal Products' Motion nor its proposed order provides sufficient detail for Plaintiffs to determine whether they are in compliance with the injunction.

## IV.   CONCLUSION

Metal Products has not argued critical elements necessary to obtain a preliminary injunction, and the elements it has argued weigh sharply against the relief it requests. For these reasons, Metal Products' Motion for a Preliminary Injunction should be denied in its entirety.

---

[7] The language in Metal Products' Proposed Order appears to be drawn from *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 484 (1996), in which the Supreme Court stated generally that "a private citizen suing under § 6972(a)(1)(B) [RCRA's citizen suit provision] could seek a mandatory injunction, i.e., one that orders a responsible party to 'take action' by attending to the cleanup and proper disposal of toxic waste . . . ."

1

2

Dated: December 24, 2018          **SHER EDLING LLP**

3                                          By: */s/ Martin D. Quiñones*
                                              VICTOR M. SHER
4                                             MATTHEW K. EDLING
                                              MARTIN D. QUIÑONES
5                                             TIMOTHY R. SLOANE

6                                         *Attorneys for Plaintiffs ALISU*
                                          *INVESTMENTS, LTD, and KARGO GROUP*
7                                         *GP, LLC*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28