DOUGLAS A. HENDERSON (Pro Hac Vice)
dhenderson@kslaw.com
**KING & SPALDING LLP**
1180 Peachtree St NE
Atlanta, GA 30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100

BRIAN PRIESTLEY (SBN 301586)
bpriestley@kslaw.com
**KING & SPALDING LLP**
653 W. 5th Street, Suite 1600
Los Angeles, CA 90071
Telephone: (213) 443-4348

Attorney for Defendant
RHEEM MANUFACTURING COMPANY

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALISU INVESTMENTS, LTD. and KARGO GROUP GP, LLC<br><br>Plaintiffs,<br><br>v.<br><br>TRIMAS CORPORATION d/b/a NI INDUSTRIES, INC., et al.,<br><br>Defendants.<br><br>AND RELATED COUNTERCLAIMS AND CROSS-ACTION. | **Case No.: 2:16-CV-00686-GHK(PJWx)**<br><br>Hon. Michael W. Fitzgerald<br><br>**DECLARATION OF DOUGLAS A. HENDERSON IN SUPPORT OF DEFENDANT RHEEM MANUFACTURING COMPANY'S NOTICE OF MOTION AND MOTION FOR GOOD FAITH SETTLEMENT DETERMINATION**<br><br>Fifth Amended Complaint Filed: April 23, 2018<br><br>Trial Date: None Set<br><br>Date:   April 19, 2021<br>Time:   10:00 a.m.<br>Dept:   Courtroom 5A |

## <u>DECLARATION OF DOUGLAS A. HENDERSON</u>

I, Douglas A. Henderson, hereby declare as follows:

1. I am an attorney at law licensed to practice before the Courts of the State of Georgia and before this Court as Pro Hac Vice (Dkt. 117). I am a Partner at the law firm King & Spalding LLP, counsel for Defendant Rheem Manufacturing Company ("Rheem") in this action. The following facts are within my personal knowledge and, if called as a witness herein, I could and would competently testify thereto.

**<u>Allegations Against Rheem in Fifth Amended Complaint</u>**

2. On February 2, 2016, Plaintiffs Alisu Investments, Ltd. and Kargo Group GP, LLC ("Plaintiffs") filed the initial complaint in this action asserting CERCLA and related claims against certain Defendants pertaining to Plaintiffs' property located at 4901 S. Boyle Avenue, Vernon, California (Dkt No. 1) ("Plaintiffs' Property").

3. On April 23, 2018, Plaintiffs filed a Fifth Amended Complaint (the "Complaint") (Dkt No. 159) which alleges that Plaintiffs' Property was contaminated by the activities of former operators and owner of adjacent and nearby properties. Plaintiffs specifically alleged Rheem Manufacturing Company, through its former subsidiaries U.S. Spring and Bumper Company and Orendorff Manufacturing Company which operated at 3050 Leonis Boulevard, Vernon, California and 4900 S. Boyle Avenue, Vernon, California, contributed to contamination at Plaintiff's Property.

A true and correct copy of the Fifth Amended Complaint is attached hereto as **Exhibit A**.

4. Plaintiffs, through their environmental consultant, conducted Phase I and Phase II Environmental Site Assessments at the Property on March 28, 2015 and July 16, 2015, respectively.

5. Extensive sampling and investigation at and around Plaintiffs' Property identified tetrachloroethylene ("PCE"), trichloroethylene ("TCE"), trichloro-fluoromethane ("Freon 11"), benzene, and chloroform and other substances in soil, soil vapor and groundwater at Plaintiffs' Property.

6.     On March 4, 2020, the parties entered a stipulation to stay the case to permit settlement discussions (Dkt No. 284).   This Court granted the stipulation on March 5, 2020 (Dkt No. 285).

7.     The parties to the settlement agreement at issue in this motion ("Settlement Agreement" or the "Agreement") are Plaintiffs and Counter-Defendants Alisu Investments, Ltd. and Kargo Group GP, LLC and Defendant Rheem Manufacturing Company.

8.     After several months of good faith negotiations, Rheem and Plaintiffs ("Settling Parties") have agreed to and signed a settlement agreement resolving all of their competing claims in this action ("Settlement Agreement").

**Discovery to Date in this Lawsuit**

9.     After five years of environmental investigation and over five years of extensive discovery, including a deposition of a Rheem 30(b)(6) representative, and environmental data, reports, and comments made by the Department of Toxic Substances Control, among other things, the available documents and testimony show Rheem through the inspection of its former subsidiaries did not contribute to impacts at the Plaintiff's Property.

10.     Rheem has identified no materials which address cases or evidence the operations of its former subsidiaries related to Plaintiffs' Properties. In a 30(b)(6) deposition on July 11, 2019, Anthony Krell, a 15-year employee of Rheem, testified as follows:

　　　　a. Rheem searched for documents responsive to Plaintiffs' discovery requests (Deposition of Anthony Krell, July 11, 2019 ("Krell Deposition"): at 19: 6-9, 12).  Relevant portions of the Krell Deposition are attached hereto as **Exhibit B**.

　　　　b. Rheem provided all documents it had or has on the environmental issues raised by Plaintiffs (Krell Deposition at 30:18-20; 30:18-19).

11.     As for Rheem's subsidiaries at issue in this case, Mr. Krell testified that

-2-

a. Rheem closed Orendorff Manufacturing on December 31, 1966 (Krell Deposition at 29:16-17).

b. Rheem sold Orendorff Manufacturing in 1972 (Krell Deposition at 27:5-9).

c. Rheem purchased U.S. Spring and Bumper in 1954 and shut down U.S. Spring and Bumper in the January 1960 (Krell Deposition at 38:19-20; 40:24).

d. Rheem was not able to identify anyone internally who had any operational responsibilities at Rheem's former subsidiaries, Orendorff Manufacturing Company and U.S. Spring and Bumper (Krell Deposition at 44:8).

e. Rheem identified no knowledge of any of the lessees at either Orendorff Manufacturing Company or U.S. Spring and Bumper (Krell Deposition at 50:19-20).

f. Rheem identified no information on the number of employees at the Orendorff Manufacturing Company or U.S. Spring and Bumper facilities (Krell Deposition at 57:14).

g. Rheem identified no list of equipment used at Orendorff Manufacturing Company or U.S. Spring and Bumper (Krell Deposition at 54:4-5).

h. Rheem identified no information on any construction, demolition, installation of equipment, or anything related to these topics at Orendorff Manufacturing Company or U.S. Spring and Bumper (Krell Deposition at 67:11).

i. Rheem identified no information on permits at Orendorff Manufacturing Company or U.S. Spring and Bumper (Krell Deposition at 67:20-25).

j. Rheem identified no records on environmental conditions or what occurred at the Orendorff Manufacturing Company or U.S. Spring and Bumper properties (Krell Deposition at 68:9-12).

-3-

12.     As for the operations at Rheem's subsidiaries at issue in this case, Mr. Krell testified further that

a. Rheem identified no information on the operations of Orendorff Manufacturing (Krell Deposition at 57:5).

b. None of the documents produced by Rheem mentioned chemicals or substances used at its former operations (Krell Deposition at 63:16-20).

c. Rheem identified no documents for Orendorff Manufacturing or U.S. Spring and Bumper on the chemicals used at these locations (Krell Deposition at 74:14-18).

d. Rheem identified no documents that mentioned any chemicals used at its former subsidiaries in the 1950s and 1960s (Krell Deposition at 73:9-12).

e. Rheem produced all of the information it had on the properties in Vernon and none of them mentioned chemicals at the plants (Krell Deposition at 64:1-3).

f. Rheem has not identified any other environmental conditions reports related to the Property (Krell Deposition at 24:9-11).

g. Rheem identified no information on "vapor degreasers" at the properties (Krell Deposition at 59:7-9).

h. None of the documents produced by Rheem mentioned "degreasers," and Rheem identified no information on the installation or removal of metal plating equipment at the 4900 or 4910 properties.   (Krell Deposition at 66:9-22).

i. Rheem identified no reports or analyses or data concerning environmental conditions at the property from the 1950s or sixties, and Rheem found no information on spills or releases of chemicals at the property during the time it owned them (Krell Deposition at 69:8, 13).

13.     With respect to documents, reports, or information produced by either the

-4-

Plaintiffs or other Defendants in this lawsuit to date, Rheem has identified no public documents, no documents or materials produced during discovery, or deposition testimony which indicates that either U.S. Spring and Bumper Company or Orendorff Manufacturing Company spilled, released, or discharged chemicals which may have contributing to contamination at the Plaintiffs' Property or the Off-Site Properties.

**Agreement to Settle**

14.   Despite its limited liability exposure, if any, Rheem has agreed to settle all claims against it for a significant sum, a decision based on the non-trivial cost of continuing to litigate this case through trial, and contingent upon court approval of this good faith settlement motion.

15.   The essential terms of the settlement are as follows:

   a.   The settlement amount paid to Plaintiffs is a low five-figure sum.

   b.   Rheem and Plaintiffs entered into this Agreement in good faith to resolve the lawsuit and avoid protracted litigation and costs.   The Agreement is not an admission of liability or fault by either party and none of the allegations in the Complaint.

   c.   Plaintiffs will dismiss their lawsuit as against Rheem with prejudice.

   d.   Plaintiffs and Rheem will bear their respective costs that arose during the course of this litigation.

   e.   The settlement is contingent on the Court's approval of this Motion for Good Faith Settlement Determination.

   f.   The Settlement Agreement does not impose an indemnification obligation on Rheem or Plaintiffs.

   g.   Plaintiffs and Rheem have agreed to a mutual release concerning contamination on Plaintiffs' Property.

16.   The pleadings and claims being resolved by this settlement are Plaintiffs' Complaint, which was filed on April 23, 2018 (Dkt. No. 159).

17.   Public records, documents produced during discovery, a deposition of a

-5-

Rheem 30(b)(6) representative, and the results of environmental testing shows that Rheem's former subsidiaries did cause or contribute to the contamination on Plaintiffs' Property.   Accordingly, the settlement amount is more than fair, reasonable, and adequate to Plaintiffs and co-defendants and has been made in good faith.

18.   The Settling Parties have agreed to cooperate in filing this Motion seeking an Order from the Court under Code of Civil Procedure section 877.6 *et seq.* and Federal common law, that the Settlement Agreement is in good faith.

19.   The settlement between Rheem and Plaintiffs satisfies all of the *Tech-Bilt* factors.

20.   The settlement is the result of arms-length negotiations over approximately nine months between counsel for Plaintiffs and counsel for Rheem and involves no collusion of any sort among any parties.

21.   Liability is vigorously disputed between the parties.

22.   The settlement amount is less than the total demanded.

23.   The Settling Parties and their counsel are aware of the inherent risks of litigation, including the risk that Plaintiffs might not prevail at trial against Rheem.

24.   Rheem believes that it would prevail at trial on Plaintiffs' claims.

25.   There is no issue relative regarding allocation of the settlement proceeds among the settling plaintiffs, as the settlement proceeds are directed to and shall be paid equally among the two plaintiffs.

26.   That an amount paid in settlement is less than would be awarded at trial if liability established does not appear to be a concern and has not been raised by any of the parties.

27.   The amount paid in settlement here is less than the original amount demanded by Plaintiffs and surely less than would have been awarded at trial if liability were established.

28.   The settlement does not include any collusive terms and will not injure the interests of any non-settling parties.

-6-

29.    Because there is no assignment of indemnity rights with this settlement, there is no issue concerning the financial condition or insurance policy limits of Rheem or Plaintiffs.

30.    The settlement may affect the following remaining co-defendants and joint tortfeasors:  Trimas Corporation d/b/a NI Industries, Inc., Bradford White Corporation, Luppe Ridgway Luppen, Paula Busch Luppen, Metal Products Engineering, Deutsch/SDL, Ltd., and Infinity Holdings, LLC.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed in Atlanta, Georgia on the 18th day of March 2021.

*/s/ Douglas A. Henderson*
DOUGLAS A. HENDERSON

HENDERSON DECLARATION IN SUPPORT OF RHEEM MANUFACTURING COMPANY'S MOTION FOR GOOD FAITH SETTLEMENT DETERMINATION – USDC CASE NO. 2:16-CV-00686-GHK(PJWx)

# EXHIBIT A

VICTOR M. SHER (SBN 96197)
vic@sheredling.com
MATTHEW K. EDLING (SBN 250940)
matt@sheredling.com
MARTIN D. QUINONES (SBN 293318)
marty@sheredling.com
**SHER EDLING LLP**
100 Montgomery Street, Ste. 1410
San Francisco, CA 94104
Tel: (628) 231-2500
Fax: (628) 231-2929

*Attorneys for Plaintiffs ALISU INVESTMENTS, LTD,*
*and KARGO GROUP GP, LLC*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ALISU INVESTMENTS, LTD. and KARGO GROUP GP, LLC, | Case No. 2:16-CV-00686 MWF (PJWx) |
| Plaintiffs, | **PLAINTIFFS' FIFTH AMENDED COMPLAINT FOR:** |
| v. | **1. LIABILITY FOR RESPONSE COSTS UNDER CERCLA;** |
| TRIMAS CORPORATION d/b/a NI INDUSTRIES, INC., BRADFORD WHITE CORPORATION, LUPPE RIDGWAY LUPPEN, PAULA BUSCH LUPPEN, METAL PRODUCTS ENGINEERING, DEUTSCH/SDL, LTD., RHEEM MANUFACTURING COMPANY, and INFINITY HOLDINGS, LLC, | **2. DECLARATORY RELIEF UNDER CERCLA;** <br> **3. LIABILITY FOR RESPONSE COSTS UNDER CALIFORNIA HEALTH & SAFETY CODE;** <br> **4. IMPLIED EQUITABLE INDEMNITY AND/OR PARTIAL IMPLIED EQUITABLE INDEMNITY;** <br> **5. CONTINUING PRIVATE NUISANCE;** <br> **6. CONTINUING TRESPASS;** <br> **7. WASTE;** <br> **8. NEGLIGENCE; and** <br> **9. DECLARATORY RELIEF.** |
| Defendants. | |
| AND ALL COUNTERCLAIMS | **JURY DEMAND** |

# <u>Table of Contents</u>

**PARTIES** ......................................................................................................... 1

   I.   PLAINTIFFS ....................................................................................... 1

   II.  DEFENDANTS ................................................................................... 1

**JURISDICTION AND VENUE** ...................................................................... 2

**GENERAL ALLEGATIONS** ......................................................................... 3

   Ownership History of the Property ........................................................ 3

   Contamination of the Property ............................................................... 3

   Environmental Characteristics of Subsurface Beneath and Near the Property .................. 5

   Use of Chlorinated Solvents in Industrial Applications ......................... 6

   Contamination Caused by Bradford White's and Norris's Activities and Operations at the Property ............................. 8

   Contamination Caused by Operations and Activities at the Neighboring Properties ....... 10

      A.   3050 Leonis Blvd. ................................................................ 10

      B.   4900 and 4910 South Boyle Ave. ....................................... 13

      C.   4724 South Boyle Ave. ........................................................ 16

   Plaintiffs Are Injured ........................................................................... 17

**FIRST CLAIM FOR RELIEF**
(Liability for Response Costs under CERCLA) ........................................... 18

**SECOND CLAIM FOR RELIEF**
(Declaratory Relief under CERCLA) .......................................................... 19

**THIRD CLAIM FOR RELIEF**
(Liability for Response Costs under California Health & Safety Code § 25363) ................ 20

**FOURTH CLAIM FOR RELIEF**
(Implied Equitable Indemnity and/or Partial Implied Equitable Indemnity) ........................... 21

**FIFTH CLAIM FOR RELIEF**
(Continuing Private Nuisance) ................................................................... 22

**SIXTH CLAIM FOR RELIEF**
(Continuing Trespass) ............................................................................... 23

**SEVENTH CLAIM FOR RELIEF**
(Waste) .............................................................................................................. 24

**EIGHTH CLAIM FOR RELIEF**
(Negligence) ....................................................................................................... 25

**NINTH CLAIM FOR RELIEF**
(Declaratory Relief) ........................................................................................... 26

**PRAYER FOR RELIEF** ......................................................................................... 27

**JURY DEMAND** ...................................................................................................... 28

Plaintiffs Alisu Investments, Ltd. and Kargo Group GP, LLC, with personal knowledge as to their own actions, and upon information and belief as to all other facts except where expressly noted, allege as follows:

### PARTIES

### I.     PLAINTIFFS

1.     Plaintiffs Alisu Investments, Ltd., a California limited partnership ("Alisu"), and Kargo Group GP, LLC, a California limited liability company ("Kargo") (collectively, "Plaintiffs"), are the owners of certain real property located at the street address of 4901 S. Boyle Avenue, Vernon, California, 90058, identified by Assessor's Parcel Numbers 6303-024-002, 6303-024-005, 6303-024-019 and 6303-024-020, and totaling approximately 3.65 acres (the "Property"). Alisu owns a 75% undivided interest and Kargo owns a 25% undivided interest as tenants-in-common in the Property.

### II.     DEFENDANTS

2.     Defendant TriMas Corporation ("TriMas") currently does business under the name NI Industries, Inc., and is the successor-in-interest to Norris Industries, Inc. ("Norris"). Norris is a former tenant and operator of the Property, and a former owner and operator of real property located at the street address 3050 Leonis Blvd., Vernon, California, 90058, identified by Assessor's Parcel Number 6303-024-022. Norris is also a former owner and operator of real property at the street address 4900 S. Boyle Avenue, Vernon, California, 90058, identified by Assessor's Parcel Number 6303-025-009.

3.     Defendant Bradford White Corporation ("Bradford White"), in its own name and as the successor-in-interest to Republic Heater Corp and/or Republic-Odin Appliance Corp., is a former tenant and operator of the Property.

4.     Defendants Luppe Ridgway Luppen and Paula Busch Luppen are co-trustees of the Luppe and Paula Luppen Living Trust. They, as co-trustees, are the current owners of real property located at the street address 3050 Leonis Blvd.,

Vernon, California, 90058, identified by Assessor's Parcel Number 6303-024-022. Defendant Luppe Ridgway Luppen owned that property in his individual capacity and d/b/a Luppen Properties between approximately 1988 and 2000.

5. Defendant Metal Products Engineering was the owner of the real property located at 3050 Leonis Blvd., Vernon, California, 90058 between approximately 1986 and 1988, and has been a tenant and operator at that property since approximately 1994.

6. Defendant Infinity Holdings, LLC is the owner of real property located at the street addresses 4724 and 4900 S. Boyle Avenue, Vernon, California, 90058, identified by Assessor's Parcel Numbers 6303-020-002 and 6303-025-009 respectively.

7. Defendant Deutsch/SDL, Ltd. is the owner of real property located at the street address 4910 S. Boyle Avenue, Vernon, California, 90058, identified by Assessor's Parcel Number 6303-025-013.

8. Defendant Rheem Manufacturing Company, in its own name and as the successor-in-interest to U.S. Spring and Bumper Company and Orendorff Manufacturing Company, is a former operator of the properties at 4900 and 4910 S. Boyle Avenue, Vernon, California, 90058.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over these claims pursuant to 42 U.S.C. § 9607, providing jurisdiction over controversies arising under CERCLA; 28 U.S.C. § 1331, providing jurisdiction over federal questions; 28 U.S.C. §§ 2201–02, providing jurisdiction over declaratory relief actions; and 28 U.S.C. § 1367(a), providing supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

10. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b), in that the releases or threatened releases of hazardous substances that give rise to these

claims are alleged to have occurred in this District and the property at issue is located in this District.

## GENERAL ALLEGATIONS

### Ownership History of the Property

11.     Alisu and Kargo are tenants-in-common and successors-in-interest to Boyle Avenue Properties, a California partnership ("BAP"). BAP is the successor-in-interest to Alisu, a prior owner of the Property.

12.     On or about December 19, 1980, Alisu purchased the Property, except for a 170' x 248' parcel excluded from the sale, from the Mutual Benefit Life Insurance Company. On or about January 12, 1981, Alisu transferred its ownership interest in the Property to BAP.

13.     On or about November 29, 2000, BAP obtained a judgment quieting title on the 170' x 248' parcel that was not part of the original sale through adverse possession.

14.     On or about December 16, 2014, BAP quitclaimed the Property to Plaintiffs as tenants-in-common, with Alisu owning a 75% undivided interest and Kargo owning a 25% undivided interest.

### Contamination of the Property

15.     The various activities conducted by Defendants as operators at the Property and at real property located at 3050 Leonis Blvd., and 4724, 4900 and 4910 S. Boyle Avenue, (the "Neighboring Properties"), and/or activities conducted by former operators at Neighboring Properties of which Defendants are owners, involved the use of chlorinated solvents including trichloroethylene ("TCE") and tetrachloroethylene ("PCE"). Those activities of the Defendants, and/or of former operators at properties owned by Defendants, caused TCE and PCE to be discharged into the subsurface at the Property and each of the Neighboring Properties, in the circumstances and at the times described below, which in turned caused continuing releases of TCE and PCE onto and under the Property that continue today.

16.     In addition, activities conducted by Defendant TriMas's predecessor Norris at the Property and at the property located at 3050 Leonis Blvd. involved chemicals containing perchlorate, and caused that perchlorate to be discharged into the subsurface at the Property and at the 3050 Leonis Blvd. property, in the manner and at the times described below, which in turned caused a release or releases of perchlorate onto and under the Property, where it persists today.

17.     TCE and PCE are highly persistent contaminants in both soil and groundwater, and tend to spread slowly over time from a release point. These compounds have very low solubility in water, can become trapped in significant quantities in soils, and exhibit only limited degradation by natural environmental processes. TCE and PCE are also more dense and less viscous than water, and therefore tend to sink downward from the ground surface through unsaturated subsurface soils and into groundwater aquifers. Both chemicals also spread laterally in soil and groundwater as a pure solvent, as a dissolved component in water, and as a vapor. Both chemicals are highly toxic, with a Maximum Contaminant Level for drinking water set by the EPA of just 5 parts per billion. As a result of their persistence in the environment and high toxicity, even limited source areas or small TCE and PCE releases can contaminate large areas of soil and large volumes of groundwater beyond the original point source. The contaminated groundwater plumes that form from the release of these two solvents generally spread both vertically and horizontally over time.

18.     Perchloric acid and most perchlorate salts are readily soluble in water, which generates the perchlorate anion in solution. The perchlorate anion is chemically stable, non-volatile and sparingly sorbed[1] by soils, which makes it a highly persistent contaminant in the environment. Due to its high solubility and

---

[1] "Sorption" is the physical and chemical process by which one substance becomes attached to another. The phrase "sorbed by soils" as used here refers to either absorption or adsorption of the substance by soil.

**PLAINTIFFS' FIFTH AMENDED COMPLAINT;**
**CASE NO. 2:16-CV-00686 MWF (PJWx)**

limited attenuation by degradation and sorption, perchlorate is also highly mobile in groundwater. The persistence and mobility of perchlorate, together with its toxicity at low part per billion concentrations, means even limited releases can contaminate large areas of an aquifer. As is typical of highly mobile contaminants in general, the spatial extent of perchlorate-contaminated groundwater tends to grow larger with time.

**Environmental Characteristics of Subsurface Beneath and Near the Property**

19. Based on soil, soil gas, and groundwater testing conducted at and under the Property, contaminants of concern are present including chlorinated solvents including but not limited to PCE and TCE, and the hazardous chemical perchlorate.

20. Through environmental consultant Environmental Audit, Inc. ("EAI"), Plaintiffs have conducted Phase I and Phase II Environmental Site Assessments at the Property, as well as ground water monitoring and testing. Plaintiffs completed Phase I on March 28, 2015, and Phase II on July 16, 2015. Through EAI's testing of soil gas, soil, and indoor air at the Property, Plaintiffs discovered for the first time that the indoor air, soil, and subsurface at the Property was contaminated with, *inter alia*, PCE and TCE, at concentrations above screening levels developed by the State of California Department of Toxic Substances Control ("DTSC") and the United States Environmental Protection Agency ("EPA") for commercial-industrial land use. EAI's testing also revealed that PCE and TCE concentrations in the ground water at the Property exceeded the Maximum Contaminant Levels ("MCLs") established for drinking water, which prompted EAI's recommendation that two additional ground water wells be installed on the Property. Plaintiffs submitted a workplan to DTSC on December 14, 2016 ("the workplan"), to conduct supplemental groundwater and soil testing, and thereafter conducted additional testing at the Property throughout 2017 with DTSC's input and guidance, including removing a concrete foundation slab; testing soil and industrial residues found underneath the slab; installing additional groundwater monitoring wells that also act

1    as soil vapor probes to further investigate the north and northwest portions of the
2    Property's subsurface; and testing for additional chemicals of concern, including
3    perchlorate.

4        21.    In total, Plaintiffs have installed six groundwater monitoring wells at
5    points along all four sides of the perimeter of the property, and are regularly
6    monitoring the contaminant concentrations measured in those wells, pursuant to the
7    workplan. Plaintiffs submitted a Groundwater Monitoring Well Installation Report
8    to DTSC on November 28, 2017, in response to which DTSC provided comments
9    on February 26, 2018, recommending additional development of the six monitoring
10   wells. Plaintiff submitted its First Semi-Annual 2018 Groundwater Monitoring
11   Report to DTSC on March 26, 2018, pursuant to the workplan and in response to
12   DTSC's February 26, 2018 comments. To date, TCE and PCE have been detected
13   in concentrations exceeding the relevant MCLs in every groundwater sample
14   collected from each well. Perchlorate has been detected in every well, and at
15   concentrations exceeding the relevant MCL in samples taken from two wells.

16       22.    In general, when chemical contaminants are released into the
17   subsurface environment, they tend to disperse outward from a release point under
18   the influence of the local groundwater gradient and soil vapor pressure. That is,
19   contaminants introduced to the subsurface tend to spread outward and migrate in the
20   direction that groundwater and soil vapor naturally flow.

21       23.    Groundwater elevation measurements conducted at the Property by
22   EAI and measurements gathered at other properties in the neighborhood show that
23   the local groundwater gradient flows west-southwest, and has historically moved in
24   the same direction. Groundwater and soil vapor in the subsurface under and in the
25   vicinity of the Property therefore flow from the east-northeast to the west-southwest
26   over time.

27              **Use of Chlorinated Solvents in Industrial Applications**

28       24.    Virtually all industrial metal-working, which includes but is not limited

to manipulation of metal by cutting, shaping, machining, pressing, smithing or otherwise, requires the use of oil or grease as a cooling agent and lubricant to prevent heat warpage, among other unwanted effects, caused by frictional and/or direct heating of the worked product. After the product has been manipulated, leftover oil and grease must be removed from the finished product by application of a degreasing agent. TCE and PCE were and are two very common industry-standard degreasing agents that have been used in virtually all industrial metal-working applications through the 20th century. TCE was commonly used as a degreasing agent in industrial settings in Los Angeles County prior to 1968, and PCE is still used in various industrial and commercial settings, including as a dry-cleaning solvent, even today.

25.	The inadvertent and intentional discharge of solvents to the environment is a regular and inevitable occurrence during the normal course of industrial activities involving solvents such as TCE and PCE, including the activities carried out at the Property and the Neighboring Properties at various times from the 1920s to the present.

26.	Such discharges occur in several ways, including, but not limited to:

a.	Human error, including spills during transport, use, tank filling, and disposal;

b.	Damage to solvent containment structures due to corrosion or breaching of piping, storage containers, or environmental control equipment;

c.	Leakage from joints and connections on solvent-containing equipment;

d.	"Drag out" from degreaser units, meaning the portion of solvent carried out of the degreaser during removal of the part being degreased, to which the solvent clings or is trapped;

e.	Intentional disposal of solvents or wastes containing solvents to land, including such disposals performed pursuant to solvent manufacturers' instructions;

**PLAINTIFFS' FIFTH AMENDED COMPLAINT;**
**CASE NO. 2:16-CV-00686 MWF (PJWX)**

f.  Emission of fugitive solvents used during vapor degreasing; and

g.  Leaks from sumps, floor drains, and sewer lines that convey solvent-containing wastes away from industrial operations.

**Contamination Caused by Bradford White's and Norris's Activities and Operations at the Property**

27.     Bradford White's and Norris's activities and operations at the Property during their respective occupancies involved the use, storage, and/or transport of PCE, and caused PCE to be released to the subsurface beneath the Property in the manner described below.

28.     Bradford White continuously operated a water heater manufacturing business at the Property from approximately 1974 through 1980. That manufacturing process involved cutting, shaping, pressing, shearing, machining, and otherwise manipulating various metal parts for inclusion in water heaters. Such activities involved using oil and/or grease as coolants and lubricants during processing. In particular, Bradford White manufactured "glass-lined" water heaters at the Property, which have a porcelain enamel coating on the interior wall of the water storage tank to prevent corrosion of the tank by the water it contains. Before applying the enamel coating, the Bradford White degreased each tank to remove impurities that would prevent the coating from bonding properly to the metal, and the standard practice in the industry during the period when Bradford White used the Property for water heater manufacturing was to use PCE as the primary degreasing agent. Bradford White's water heater manufacturing activities at the property continuously utilized chlorinated solvents, including PCE, to degrease finished metal parts, including water heater tanks.

29.     Bradford White regularly used and handled PCE in the normal course of its business as an operator at the property manufacturing water heaters between 1974 and 1980, and regularly released PCE to the Property's subsurface during those years, intentionally or unintentionally, under one or more of the circumstances or

discharge and/or disposal described above in Paragraph 26, where it has persisted and remains today.

30. From approximately 1981 until 1991, Norris operated the Property as an equipment storage facility. In particular, Norris stored manufacturing equipment owned by the United States government that was loaned to Norris for use in completing defense manufacturing contracts between Norris and the United States, including the manufacturing of munitions.

31. At all relevant times, the United States imposed specifications for the storage of government-owned equipment loaned to contractors, including Norris. Among other requirements, the specifications required that a thick, viscous, petroleum-based rust inhibitor known as "cosmoline" be applied to the surfaces of the equipment during transport and storage, to prevent corrosion. A standard method for removing cosmoline from large equipment is, and was during the relevant time period, to apply PCE, either manually or by immersing the equipment in a vapor degreaser. Throughout the relevant years, Norris transported equipment between the Property and other locations where the equipment was used in manufacturing. As part of that process, Norris cleaned equipment being placed in or removed from storage at the Property, including by applying and removing cosmoline.

32. Soil samples collected by EAI from beneath drainage troughs at the Property in July 2017 contained chemical components of cosmoline as well as chlorinated solvents including PCE, indicating that PCE was used at the Property to remove cosmoline, and that both PCE and cosmoline were released to the subsurface.

33. Based on the foregoing, Norris regularly used PCE to remove cosmoline from government-owned equipment in its regular course of business as an operator storing and transporting that equipment at the Property between 1981 and 1991. On information and belief, Norris regularly released PCE and/or PCE-contaminated cosmoline to the Property's subsurface during those years,

intentionally or unintentionally, under one or more of the circumstances or discharge and/or disposal described above in Paragraph 26, including by depositing PCE and/or PCE-contaminated cosmoline into floor drainage troughs, whence it escaped to the subsurface either directly or by leaking from underground sewer pipes. PCE and PCE-contaminated cosmoline have persisted and remain in the Property's subsurface today.

34.     In sum, Defendants Bradford White and TriMas necessarily and regularly released PCE on, into, and under the Property during the period approximately spanning 1974 to 1991 in the normal course of their industrial activities involving PCE at the Property.

## Contamination Caused by Operations and Activities at the Neighboring Properties

35.     The real Neighboring Properties are discussed below. Hazardous chemicals, including but not limited to TCE, PCE, and perchlorate have been released from each of those properties onto and under the Property.

**A.     3050 Leonis Blvd.**

36.     The real property located at 3050 Leonis Blvd. abuts the Property immediately to the Property's north, and its southern boundary runs west from S. Boyle Ave. approximately two-thirds the length of the Property. Because the 3050 Leonis Blvd. property is set north and northeast of the Property, it is upgradient, and any subsurface contaminants beneath the 3050 Leonis Blvd. property, will naturally migrate onto and under the 4901 S. Boyle Ave. property, following the west-southwest direction of groundwater flow and soil gas pressure.

37.     Norris owned the 3050 Leonis Blvd. property between 1966 and 1986. Between approximately 1966 and 1986, Norris operated the 3050 Leonis Blvd. property as a warehouse and conducted some manufacturing there. City of Vernon Public Works Department records show that beginning in 1967, Norris maintained a 720 cubic foot metal shed approximately 50 feet north of the southern boundary of

**PLAINTIFFS' FIFTH AMENDED COMPLAINT;**
**CASE NO. 2:16-CV-00686 MWF (PJWx)**

the property for the storage of large volumes of sodium nitrate. Sodium nitrate is used in many industrial processes, including as a source of nitrogen in fertilizer, as an oxidizing agent in munitions and products such as flares, as a food preservative, and as a reagent in the manufacturing of glass. Sodium nitrate, especially sodium nitrate in industrial use during the period Norris occupied the 3050 Leonis Blvd. property, is largely mined from deposits that also contain naturally occurring perchlorate at concentrations of between 500 and 2,000 parts per billion. Perchlorate contamination is frequently observed in the subsurface in areas where sodium nitrate has been used, stored, or disposed.

38.     During Norris's storage of sodium nitrate at the 3050 Leonis Blvd. property between approximately 1967 and 1986, and its transportation of sodium nitrate to and from its storage shed at the 3050 Leonis Blvd. property throughout that period, sodium nitrate containing perchlorate escaped to the environment through spilling, dissolving, or another manner of discharge, migrated to the subsurface, and was released to the Property following the flow of groundwater. The discharges to the subsurface occurred on a continuing basis from 1967 through the time Norris ceased storing sodium nitrate at the 3050 Leonis property, and the release or releases from the 3050 Leonis Blvd. property to 4901 S. Boyle Ave. through the subsurface have occurred continuously, and are occurring today, since 1967.

39.     In 1986, Norris sold the 3050 Leonis Blvd. property to Defendant Metal Products Engineering. Defendant Metal Products Engineering conveyed title to the property two years later to Defendant Luppe Luppen, who held it in his own name and d/b/a Luppen Properties between 1988 and 2000. In 2000, title to the property was conveyed to Defendants Luppe Luppen and Paula Busch Luppen as co-trustees of the Luppe and Paula Luppen Living Trust, and has been so held since.

40.     Since 1994, Defendant Metal Products Engineering has operated at the 3050 Leonis Blvd. property conducting metal stamping, tool and die making, and assembling metal products. Metal stamping, tool and die making, and assembling

1  metal products, like other forms of industrial metal manipulation, necessarily

2  requires degreasing of both the finished workpiece and of the tools involved, which

3  typically involves the use of chlorinated or other solvents. City of Vernon records

4  and Hazardous Waste Manifests show that continuously between 1994 and the

5  present, Metal Products Engineering has used high volumes of lubricating oils, and

6  has maintained a proprietary "Safety-Kleen" tool cleaning unit, which uses an

7  aqueous solution containing small amounts of PCE in a self-contained system to

8  remove oil and grease from parts introduced to the solution. Metal Products

9  Engineering has continuously used approximately 1–3 gallons of Safety-Kleen

10  solution per day since 1994 to clean tools, and has stored approximately 20–40

11  gallons of solution in drums on the property throughout that time. Because the

12  solution is reused over time but must eventually be replaced, Hazardous Waste

13  Manifests reflect that Metal Products Engineering has generated between 20 and 60

14  gallons of Safety-Kleen solution waste each year that is regularly transported off-

15  site and replaced.

16  41.  On information and belief, Metal Products Engineering has regularly

17  released PCE-containing Safety-Kleen solution to the Property's subsurface

18  between 1994 and the present, intentionally or unintentionally, under one or more of

19  the circumstances of discharge and/or disposal described above in Paragraph 26.

20  PCE has in turn been released and continues to be released from the 3050 Leonis

21  Blvd. property, where it follows the natural flow of groundwater and soil vapor, and

22  reaches and contaminates the Property's subsurface.

23  42.  By virtue of the historic and ongoing discharges and releases of PCE

24  and perchlorate at the 3050 Leonis Blvd. property that introduced PCE and

25  perchlorate to the environment at and under that property, the property has

26  continuously released perchlorate to the Property's subsurface through groundwater

27  and soil vapor since approximately 1967, and has continuously released PCE to the

28  Property's subsurface since approximately 1994, where it has followed and follows

the natural flow of groundwater and soil vapor and reaches and contaminates the Property's subsurface.

**B.     4900 and 4910 South Boyle Ave.**

43.     The western edge of the real properties located at 4900 and 4910 S. Boyle Ave. both are located approximately 100 feet east of the Property, across S. Boyle Ave, which runs north-south. Because the 4900 and 4910 S. Boyle Ave. properties are set east of the 4901 S. Boyle Ave. property, they are upgradient, and any subsurface contaminants beneath the 4900 and 4910 S. Boyle Ave. properties will naturally migrate onto and under the Property, following the direction of groundwater flow and soil gas pressure.

44.     Between the 1920s and 1990s, industrial activities including the manufacture of metal products and equipment occurred at 4900 and 4910 S. Boyle Ave.

45.     U.S. Spring and Bumper Company occupied 4900 and 4910 S. Boyle Ave. from the 1920s to the late 1950s. City of Vernon Public Works Department documents show that U.S. Spring and Bumper installed a 1,900-ton hydraulic press at the 4910 S. Boyle Ave. property in 1952 and constructed a "farm tool" building there in 1953.

46.     U.S. Spring and Bumper Company's industrial activities at 4900 and 4910 S. Boyle Ave. included manufacturing automotive parts, and heavy farm equipment parts. These activities involved cutting, shaping, machining, and otherwise manipulating metal parts, which involved using oil and/or grease as coolants and lubricants during processing, which in turn required degreasing the completed workpieces. U.S. Spring and Bumper regularly used and handled TCE and/or PCE in the normal course of its business as an operator at the 4900 and 4910 S. Boyle Ave. properties manufacturing automotive and farm equipment parts from the 1920s through the 1950s, and regularly released TCE and/or PCE to the properties' subsurface during those years, intentionally or unintentionally, under one

1    or more of the circumstances or discharge and/or disposal described above in

2    Paragraph 26, where it has persisted and from which it has spread.

3        47.    Defendant Rheem Manufacturing Company ("Rheem") occupied 4900

4    and 4910 Boyle from the early 1950s to approximately 1956.

5        48.    Rheem's industrial activities at 4900 and 4910 S. Boyle Ave. included

6    manufacturing water heaters and boilers, and ship and aircraft parts. These activities

7    involved cutting, shaping, machining, and otherwise manipulating metal parts. Such

8    activities involved using oil and/or grease as coolants and lubricants during

9    processing. Thereafter, such activities involved degreasing finished metal parts with

10   chlorinated solvents including TCE and/or PCE. Rheem's use and handling of TCE

11   and/or PCE at the Property in the normal course of its operations caused TCE and/or

12   PCE to be continuously released to the Property's subsurface, intentionally or

13   unintentionally, under one or more of the circumstances of discharge and/or disposal

14   described above in Paragraph 26.

15       49.    Orendorff Manufacturing Company ("Ormco") occupied the 4900 and

16   4910 S. Boyle Ave. properties between approximately 1956 and 1972. Ormco was

17   acquired by Rheem in approximately 1961, including its operations at the 4900 and

18   4910 S. Boyle Ave. properties.

19       50.    Ormco's industrial activities at 4900 and 4910 S. Boyle Ave. included

20   manufacturing ground-working implements, industrial equipment, and wear parts.

21   These activities involved cutting, shaping, machining, and otherwise manipulating

22   metal parts. City of Vernon records confirm that Ormco operated various metal

23   manipulating tools there, including metal presses, drill presses, multiple welders,

24   milling machines, tool grinders, and a spray booth. Such activities involved using

25   oil and/or grease as coolants and lubricants during processing. Thereafter, such

26   activities involved degreasing finished metal parts with chlorinated solvents

27   including TCE and/or PCE. Ormco's use and handling of TCE and/or PCE at the

28   property in the normal course of its operations caused TCE and/or PCE to be

continuously released to the property's subsurface, intentionally or unintentionally, in one or more of the circumstances of discharge described above in Paragraph 26 where it has persisted and from which it has spread.

51.     Norris owned and operated the 4900 S. Boyle Ave. property from approximately 1967 to the 1990s.

52.     Norris's industrial activities at 4900 S. Boyle Ave. included, but were not limited to, ordnance manufacturing. These activities involved cutting, shaping, machining, and otherwise manipulating metal parts. City of Vernon records that Norris Industries operated various metal manipulating tools there, including, but not limited to, presses, saws, lathes, grinders, welders, shears, rollers, and drills. Such activities involved using oils and/or grease as coolants during processing, Thereafter, such activities involved degreasing finished metal parts with chlorinated solvents, including TCE and/or PCE.

53.     City of Vernon records also confirm that Norris Industries operated a degreaser and clarifier pit at the 4900 S. Boyle Ave. property, at least as early as 1969. These facilities were used to degrease metal and to clarify spent solvents, namely TCE and/or PCE. Norris's use and handling of TCE and/or PCE at the property in the normal course of its operations, including those involving its degreaser and clarifier pit, caused TCE and/or PCE to be continuously released to the property's subsurface, intentionally or unintentionally, under one or more of the circumstances of discharge and/or disposal described above in Paragraph 26, where it has persisted and from which it has spread.

54.     In sum, releases of TCE and PCE necessarily and regularly occurred on, into, and under 4900 and 4910 S. Boyle Ave. during the period beginning in the 1920s and ending not earlier than the 1990s in the normal course of industrial activities carried out by former operators of those properties, including, U.S. Spring and Bumper, Rheem, Ormco, and Norris Industries.

55.     By virtue of the historic discharges of TCE and/or PCE at the 4900 and

4910 S. Boyle Ave. properties that introduced TCE and/or PCE to the environment at and under those properties, those properties have continuously released TCE and/or PCE through groundwater and soil vapor to the property's subsurface since approximately the 1920s whence it has been released and continues to be released following the natural flow of groundwater and soil vapor, reaching and contaminating the Property's subsurface.

**C.**     **4724 South Boyle Ave.**

56.    Telephone directories, Sanborn Fire Insurance maps, and other public information show that the real property located at 4724 S. Boyle Ave. was operated as an aluminum luggage manufacturing facility between at least 1949 and 1967, by Erle P. Halliburton Inc., which also operated there under the names Halliburton Aluminum Travel Cases, Halliburton Aluminum Cases, Halliburton Inc., and/or Halliburton Enterprises, Inc. The property operated as those entities' corporate headquarters and primary manufacturing facility.

57.    During those years, chlorinated solvents including TCE, PCE, and the additional chlorinated solvent 1,1,1-trichloroethane ("111-TCA") would necessarily have been used in an aluminum product manufacturing operation such as the luggage manufacturing operations conducted at the 4724 S. Boyle Ave. to *inter alia* complete the tasks described in Paragraph 24 above. On information and belief, the operators conducting aluminum manufacturing at the 4724 S. Boyle Ave. property handled, used, and transported TCE, PCE, and/or 111-TCA, and the use and handling of TCE, PCE, and/or 111-TCA there in the normal course of operations caused those chlorinated solvents to be discharged to the property's subsurface, intentionally or unintentionally, by one or more of the methods of discharge described above in Paragraph 26, where it has persisted and from which it has spread.

58.    4724 S. Boyle Ave. is located approximately 600 feet northeast of the Property. By virtue of the historic discharges of TCE and/or PCE at the 4724 S. Boyle Ave. property that introduced TCE and/or to the environment at and under

that property, the property has continuously released TCE and/or PCE through groundwater and soil vapor from the property's subsurface since at least 1949, whence it has been released and continues to be released following the natural flow of groundwater and soil vapor, reaching and contaminating the Property's subsurface.

### Plaintiffs Are Injured

59.     Plaintiffs have never used or handled PCE or TCE at the Property.

60.     As a result of the discharges, releases and threatened releases of hazardous substances at the Property and at the Neighboring Properties, Plaintiffs have voluntarily incurred significant costs to conduct environmental investigation and remediation activities at the Property, which are still ongoing as of the date of this Fifth Amended Complaint.

61.     For example, Plaintiffs have incurred costs by installing several groundwater monitoring wells and soil vapor probes at and in the vicinity of the Property, to track the movement of TCE and PCE in the subsurface, and to assess the concentrations of those contaminants in anticipation of remediation. Some of these wells are located on the Property's borders.

62.     One function of the groundwater monitoring wells and soil vapor probes is to assess the movement of contaminants into and through the Property. Monitoring at the Property has demonstrated a change in the spatial distribution of contaminant concentrations over time, indicating that in addition to those released at the Property, contaminants have also migrated to the Property from outside sources, including the Neighboring Properties. Thus, Plaintiffs have incurred costs due to TCE and PCE releases that occurred at both the Property and the Neighboring Properties.

63.     In addition, Plaintiffs will be required in the future to expend significant amounts of money in conducting further environmental investigation and remediation activities at the Property, including but not limited to demolition and

redevelopment costs, that are attributable to TCE and PCE releases at both the Property and the Neighboring Properties. Also as a result of Defendants' actions, the Property's value has been severely diminished, among other damages.

**FIRST CLAIM FOR RELIEF**

**(Liability for Response Costs under CERCLA)**

**(Against all Defendants)**

64. Plaintiffs hereby incorporate by reference each and every allegation contained above, as though set forth herein in full.

65. The Property and the Neighboring Properties are "facilities" as that term is defined in CERCLA, 42 U.S.C. § 9601(9).

66. Defendants are "persons" as that term is defined within the meaning of CERCLA, 42 U.S.C. § 9601(21), who are potentially liable for costs incurred in response to the release or threatened release of hazardous substances.

67. As a result of Defendants' unreasonable, negligent and/or injurious method of operating their businesses and/or maintaining the Property or Neighboring Properties, the Defendants, and each of them, have caused or are otherwise responsible for the releases and threatened releases of hazardous substances into the environment, as those terms are defined in CERCLA, 42 U.S.C. §§ 9601(22) and (14) respectively.

68. The releases or threatened releases of Defendants and their predecessors, and each of them, have caused and continue to cause contamination of the indoor air, soil and groundwater on, within and under the Property.

69. The activities of Defendants and their predecessors, and each of them, including but not limited to the release and threatened release of hazardous substances into the environment, have caused Plaintiffs to incur costs to respond to said releases and threatened releases for which Defendants, and each of them, are liable under CERCLA, 42 U.S.C. § 9607.

70. The response costs incurred by Plaintiffs, including costs for

1  investigation, removal and remedial actions, are necessary and consistent with the
2  National Contingency Plan, within the meaning of 42 U.S.C. § 9607(a) and 40 C.F.R.
3  § 300, *et seq*.

4  71.  Pursuant to CERCLA, 42 U.S.C. § 9607(a), Plaintiffs are entitled to
5  reimbursement and/or contribution, to the extent allowable by law, from Defendants,
6  and each of them, for all amounts expended by Plaintiffs as a result of said
7  contamination and/or for all past and future response costs incurred by Plaintiffs in
8  investigating and/or remediating the impacts to or releases of hazardous substances
9  at the Property, in a sum to be proven at trial.

## SECOND CLAIM FOR RELIEF

### (Declaratory Relief under CERCLA)

### (Against all Defendants)

13  72.  Plaintiffs hereby incorporate by reference each and every allegation
14  contained above, as though set forth herein in full.

15  73.  Because the extent and magnitude of any contamination at the Property
16  is not fully known at this time, and because the hazardous substances at the Property
17  have not yet been fully remediated, Plaintiffs are informed and believe that they will
18  incur in the future necessary response costs, including but not limited to
19  investigatory, remedial and removal expenses, attorneys' fees and interest.

20  74.  An actual legal controversy now exists between Plaintiffs and
21  Defendants as to their respective responsibility for any compensable response costs
22  incurred by Plaintiffs in connection with this litigation and/or the Property.

23  75.  Pursuant to CERCLA, 42 U.S.C. § 9607, Plaintiffs seek a declaratory
24  judgment establishing the liability of Defendants, and each of them, for any and all
25  such response costs for the purposes of this and any subsequent action or actions to
26  recover past or future investigatory and response costs and damages.

27  76.  Such a declaratory judgment is appropriate in the interests of justice
28  because, among other reasons, it will obviate the need for multiple lawsuits, thereby

providing a complete solution for the disputes between the parties.

## THIRD CLAIM FOR RELIEF

### (Liability for Response Costs under California Health & Safety Code § 25363)

### (Against all Defendants)

77.     Plaintiffs hereby incorporate by reference each and every allegation contained above, as though set forth herein in full.

78.     Defendants are "persons" within the meaning of California Health & Safety Code § 25319.

79.     As a result of Defendants' unreasonable, negligent and/or injurious method of operating their business and/or maintaining their property or Neighboring Properties, Defendants, and each of them, have caused or are otherwise responsible for the releases and threatened releases into the environment of hazardous material, as those terms are defined in California Health & Safety Code §§ 25320 and 25316, respectively.

80.     The releases by Defendants, and each of them, of hazardous substances have caused the indoor air, soil and groundwater contamination at the Property.

81.     Defendants, and each of them, as the owners and/or operators of a facility from which there has been a release or threatened release of hazardous substances into the environment qualify as a "responsible party" and "liable person" as defined in California Health & Safety Code § 25363.

82.     The activities of Defendants, and each of them, including, but not limited to, the release and threatened release of hazardous substances into the environment, have caused Plaintiffs to incur costs to respond to said releases and threatened releases for which Defendants, and each of them, are liable under California Health & Safety Code § 25363.

83.     Pursuant to California Health & Safety Code § 25363(e), Plaintiffs are entitled to indemnification and contribution from Defendants, and each of them, for all amounts expended by Plaintiffs as a result of said contamination and/or for all

past and future response costs incurred by Plaintiffs in investigating and/or remediating the releases of hazardous substances at the Property, in a sum to be proven at trial. Plaintiffs have satisfied the notice requirement in connection with these claims and contamination at the Property.

## FOURTH CLAIM FOR RELIEF

### (Implied Equitable Indemnity and/or Partial Implied Equitable Indemnity)

### (Against All Defendants)

84.  Plaintiffs hereby incorporate by reference each and every allegation contained above, as though set forth herein in full.

85.  Defendants, and each of them, at all times relevant hereto owed Plaintiffs a duty of due care and diligence with respect to Defendants' possession, operation, maintenance and control of the Property.

86.  Defendants, and each of them, have breached said duties of care and diligence by causing, allowing or permitting the discharge or release of hazardous substances at, on and under the Property or above referenced neighboring properties.

87.  As a direct and proximate result of the actions or omissions of Defendants, and each of them, Plaintiffs have suffered and are continuing to suffer damages, including without limitation, the costs of investigating and remediating the contamination at the Property.

88.  Plaintiffs' liability, if any, for any investigation and remediation of the Property and any resultant liability to third parties, including the applicable governmental agencies, is imposed solely by statute or law irrespective of negligence or active conduct on the part of Plaintiffs.

89.  The damages, injuries and obligations incurred by Plaintiffs to investigate and remediate the contamination at the Property are exclusively the result of the acts or omissions of Defendants, and each of them.

90.  As a direct and proximate result of the acts or omissions of Defendants as alleged herein, Defendants, and each of them, are obligated to reimburse and/or

indemnify Plaintiffs for all costs and damages, including without limitation, those costs necessarily incurred in investigating and remediating the contamination at the Property and/or for any resultant liability to third parties, including the applicable governmental agencies. Such damages also include damages suffered by Plaintiffs due to increased financing costs for the Property, lost rent and diminution in the value of the Property, in a sum to be proven at trial.

91.     Alternatively, Plaintiffs are, at most, only partially responsible for such costs, damages and liabilities, and Defendants are responsible for the remainder. Plaintiffs are therefore entitled to a declaration of the proportion of fault and liability of each of the parties and to a declaration that Defendants have a duty to indemnify Plaintiffs for any sums that Plaintiffs are compelled to pay in excess of the Plaintiffs' percentage of fault, up to the extent of each such party's fault.

## FIFTH CLAIM FOR RELIEF

### (Continuing Private Nuisance)

### (Against All Defendants)

92.     Plaintiffs hereby incorporate by reference each and every allegation contained above, as though set forth herein in full.

93.     Defendants, and each of them, had a duty to operate their business and maintain the Property or Neighboring Properties in a manner that does not interfere with the Plaintiffs' right as the property owners to enjoy and use the Property.

94.     As a result of the unreasonable, negligent and injurious methods of operating their businesses and maintaining the Property or Neighboring Properties, the acts or omissions of Defendants, and each of them, directly and proximately caused discharges and releases of hazardous substances into the environment, including on, at and under the Property or Neighboring Properties which have impacted the Property.

95.     Such use, occupation, and maintenance of the Property or Neighboring Properties by Defendants, and each of them, constitutes a continuing nuisance within

the meaning of California Civil Code § 3479. The ongoing presence of the contamination from Defendants' releases of hazardous substances constitutes a continuing nuisance which has adversely impacted Plaintiffs' use and enjoyment of the Property.

96.    As a direct and proximate result of the nuisance created by Defendants, and each of them, Plaintiffs have been damaged in an amount to be determined at trial, including but not limited to damages for denial of their useful and quiet enjoyment of the Property; costs to investigate and remediate the soil and groundwater contamination; liabilities to third parties, including the applicable governmental agencies, arising from said contamination; lost rent; and other monetary damages to the extent allowable by law. Plaintiffs will continue to be adversely affected by the alleged nuisance unless and until it is abated.

97.    As a further direct and proximate result of the nuisance, the value of the Plaintiffs' Property has been diminished.

98.    Defendants, and each of them, have failed, after demand and a reasonable opportunity, to take steps to abate the nuisance caused by their activities on the Property.

99.    In accordance with California Code of Civil Procedure § 731, Plaintiffs are entitled to damages as well as injunctive and declaratory relief requiring Defendants to abate the continuing private nuisance created by their releases of hazardous substances into the environment at the Property.

## SIXTH CLAIM FOR RELIEF

### (Continuing Trespass)

### (Against All Defendants)

100.    Plaintiffs hereby incorporate by reference each and every allegation contained above, as though set forth herein in full.

101.    Plaintiffs are the owners of the Property.

102.    Defendants' actions and/or omissions have caused the releases of

1   hazardous substances into the soil and subsurface at, on and under the Property or

2   Neighboring Properties.  As a direct and proximate result of the intentional, reckless,

3   or negligent conduct of Defendants, and each of them, the Property has been

4   contaminated by said releases of hazardous substances.

5       103.   Defendants, and each of them, have failed to remove the hazardous

6   substances or to commit to the investigation and remediation, at their expense, of

7   soil and subsurface contamination at the Property.

8       104.   As a direct and proximate result of Defendants' contamination of the

9   Property and the Neighboring Properties, Plaintiffs have been damaged in that they

10  have incurred costs for the investigation and remediation of such contamination;

11  liabilities to third parties, including the applicable governmental agencies, arising

12  from said contamination; lost rent; statutory damages under Cal. Civ. Code § 3334;

13  and other monetary damages to the extent allowable by law.

## SEVENTH CLAIM FOR RELIEF

### (Waste)

### (Against TriMas Corporation d/b/a NI Industries, Inc., and Bradford White Corporation)

18  105.   Plaintiffs hereby incorporate by reference each and every allegation

19  contained above, as though set forth herein in full.

20  106.   Defendants, and each of them, had a duty to operate their business and

21  maintain the Property in a manner that does not interfere with Plaintiffs' right as the

22  property owners to enjoy and use the Property.

23  107.   Defendants, and each of them, have engaged in unreasonable, negligent

24  and injurious methods of operating their business and/or maintaining the Property,

25  and the acts or omissions of Defendants, and each of them, directly and proximately

26  caused the release of hazardous substances into the soil and subsurface at, on and

27  under the Property.

28  108.   Such actions and/or omissions of Defendants, and each of them,

constitute waste within the meaning of California Code of Civil Procedure § 732, in that they have substantially diminished the market value of Plaintiffs' Property.

109.   As a direct and proximate result of said waste, Plaintiffs have suffered and will continue to suffer damages in an amount to be proven at trial, including, but not limited to, the diminution in value of Plaintiffs' Property and other monetary damages to the extent allowable by law.

110.   As a direct and proximate result of said waste, and because Plaintiffs are informed and believe, and therefore allege, that Defendants' conduct in committing said waste was intentional, willful, and/or malicious with knowledge that it would result in substantial damage to the Property and Plaintiffs' interest in the Property, Plaintiffs are entitled to treble damages against Defendants, and each of them, pursuant to California Code of Civil Procedure § 732.

## EIGHTH CLAIM FOR RELIEF

### (Negligence)

### (Against All Defendants)

111.   Plaintiffs hereby incorporate by reference each and every allegation contained above, as though set forth herein in full.

112.   Defendants, and each of them, owed a duty to Plaintiffs to exercise due care in handling, storing and using hazardous substances and hazardous wastes at the Property or Neighboring Properties, and to not release any hazardous substances that would impact the Property.

113.   During their occupancy of the Property, Defendants, and each of them, had exclusive custody and control of their respective properties, and had control over all operations that were conducted thereon.

114.   Defendants, and each of them, released, failed to prevent, or allowed the release of hazardous substances into the soil and subsurface at, on and under the Property or Neighboring Properties. Such actions and/or omissions by Defendants are breaches of the duties owed by Defendants, and each of them, to Plaintiffs.

115.   As a direct and proximate result of said breaches of duty, Plaintiffs have been damaged, and continue to be damaged, in an amount to be proven at trial, including, but not limited to, costs to investigate and remediate any soil and groundwater contamination; the diminution in value of Plaintiffs' Property; lost rent; liabilities to third parties, including the applicable governmental agencies, arising from said contamination; increased financing costs for the Property; demolition and reconstruction costs at the Property; and other monetary damages and attorneys' fees and costs.

## NINTH CLAIM FOR RELIEF

### (Declaratory Relief)

### (Against All Defendants)

116.   Plaintiffs hereby incorporate by reference each and every allegation contained above, as though set forth herein in full.

117.   An actual controversy exists between the Plaintiffs and the Defendants herein in that Plaintiffs contend and the Defendants deny that if Plaintiffs' allegations with respect to their damages and injury are true, that the Defendants, and each of them, have responsibility for such costs and damages that have been or will be incurred for activities performed and/or to be performed in the investigation, assessment, monitoring, treatment, removal, remediation and cleanup of soil, soil vapor, and groundwater contamination at the Property, for the diminution in the market value, the loss of rent and use of the Property, and the liabilities to third parties and for such other damages in amounts that Plaintiffs will continue to incur.

118.   Plaintiffs request that a judicial determination and declaration setting forth the parties' rights and obligations as necessary and appropriate in order to avoid a multiplicity of actions and in order for the respective parties herein to ascertain their rights and duties with respect to the Plaintiffs' claims herein, and each of them.

## **PRAYER FOR RELIEF**

1. For reimbursement of, indemnification for, and/or contribution, to the extent allowable by law, for all costs and any third-party or other liability incurred by Plaintiffs as a result of the actions of Defendants alleged above;

2. For actual damages in an amount to be proven at trial, resulting from the presence of vapor, groundwater, soil and/or subsurface contamination at, on and under the Property, including, without limitation, the expenses of investigating and remediating such contamination; diminution of the Property's value; costs of demolition and reconstruction of structures on the Property; lost rent; liabilities to third parties, including the applicable governmental agencies, arising from said contamination; increased financing costs for the Property; and other monetary damages;

3. For treble damages against Defendants, and each of them, pursuant to California Code of Civil Procedure § 732;

4. For a judicial determination declaring the rights and obligations of the parties in connection with the claims for relief asserted in this Complaint;

5. For injunctive relief;

6. For attorneys' fees and costs of suit herein incurred as permitted by law;

7. For pre-judgment interest at the maximum legal rate; and

8. For such other and further relief as may be just and proper.

Dated: April 23, 2018          **SHER EDLING LLP**


                    By:   */s/ Matthew K. Edling*
                          MATTHEW K. EDLING

                          *Attorneys for Plaintiffs ALISU
                          INVESTMENTS, LTD, and KARGO GROUP
                          GP, LLC*

## JURY DEMAND

Plaintiffs Alisu Investments, Ltd. and Kargo Group GP, LLC hereby demand a jury on the claims for relief to which a jury is allowed.

Dated: April 23, 2018    **SHER EDLING LLP**


By: */s/ Matthew K. Edling*
   MATTHEW K. EDLING

   *Attorneys for Plaintiffs ALISU*
   *INVESTMENTS, LTD, and KARGO GROUP*
   *GP, LLC*

# EXHIBIT B



## Planet Depos®
We Make It *Happen*

# Transcript of Anthony Krell, Corporate Designee

**Date:** July 11, 2019
**Case:** Alisu Investments, LTD, et al. -v- Trimas Corporation, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING | INTERPRETATION | TRIAL SERVICES

1                    UNITED STATES DISTRICT COURT
         CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
2

3
         ALISU INVESTMENTS, LTD.
4        and KARGO GROUP GP, LLC,

5              Plaintiffs,
                                      Case No. 2:16-CV-00686
6        vs.                          MWF (PJWx)

7        TRIMAS CORPORATION d/b/a
         NI INDUSTRIES, INC.,
         BRADFORD WHITE
8        CORPORATION, LUPPE
         RIDGWAY LUPPEN, PAULA
9        BUSCH LUPPEN, METAL
         PRODUCTS ENGINEERING,
10       DEUTSCH/SDL, LTD., RHEEM
         MANUFACTURING COMPANY,
11       and INFINITY HOLDINGS,
         LLC,
12
               Defendants.
13

14          RULE 30(b)(6) VIDEO DEPOSITION OF RHEEM
                     MANUFACTURING COMPANY
15          THROUGH WITNESS ANTHONY KRELL
                     July 11, 2019
16                    10:02 a.m.
                  King & Spalding LLP
17           1180 Peachtree Street, NE
                     Suite 1600
18               Atlanta, Georgia

19          Valerie N. Almand, RPR, CRR, CRC
         Jenna Edmunds, Legal Video Specialist
20

21

22

23

24

25

Transcript of Anthony Krell, Corporate Designee
Conducted on July 11, 2019                          19

| | | |
|---|---|---|
| 1 | that have been identified in the notice of | 10:17:51 |
| 2 | deposition? | 10:17:55 |
| 3 | A.  No, there's not. | 10:17:55 |
| 4 | Q.  Okay.  Do you know why you were selected | 10:17:56 |
| 5 | to testify for Rheem in this deposition? | 10:18:07 |
| 6 | A.  I mean, I'm a 15-year employee of Rheem | 10:18:13 |
| 7 | Manufacturing Company and part of my job duties | 10:18:21 |
| 8 | are being a 30(b)(6) in other matters, so I'm | 10:18:26 |
| 9 | familiar with the process. | 10:18:30 |
| 10 | Q.  Great.  Okay.  So generally what did you | 10:18:31 |
| 11 | do to prepare for today's deposition? | 10:18:41 |
| 12 | A.  So generally I met with one of our legal | 10:18:45 |
| 13 | assistants and our corporate here in Atlanta, | 10:18:51 |
| 14 | along with our risk manager, to go over the | 10:18:55 |
| 15 | documents that Rheem has produced and just the | 10:18:59 |
| 16 | process that was done to get those documents | 10:19:03 |
| 17 | pulled together.  I've reviewed the depo notice, | 10:19:07 |
| 18 | I've reviewed several of the pleadings and I | 10:19:17 |
| 19 | reviewed the documents that Rheem's produced, | 10:19:20 |
| 20 | along with some other documents that have been | 10:19:22 |
| 21 | produced by others. | 10:19:24 |
| 22 | Q.  Okay.  Great.  Just quickly, what's the | 10:19:25 |
| 23 | name of the risk management officer that you spoke | 10:19:29 |
| 24 | with? | 10:19:31 |
| 25 | A.  This would be Jennifer McArthur. | 10:19:32 |

Transcript of Anthony Krell, Corporate Designee
Conducted on July 11, 2019                          30

| | | |
|---|---|---|
| 1 | came into Rheem -- I'm assuming that's the correct | 10:37:32 |
| 2 | date.  But as far as I know, they eventually | 10:37:35 |
| 3 | merged into Rheem. | 10:37:37 |
| 4 | Q.  Okay.  And then you said your | 10:37:38 |
| 5 | understanding is Rheem sold Orendorff to Opal in | 10:37:41 |
| 6 | 1972? | 10:37:46 |
| 7 | A.  I can't -- 1971, '72, somewhere in that | 10:37:48 |
| 8 | timeframe, yes. | 10:37:52 |
| 9 | Q.  Okay, great.  Is it Rheem's understanding | 10:37:53 |
| 10 | that they acquired any liabilities that Orendorff | 10:38:06 |
| 11 | held as a result of the merger on 12 -- in 1966, | 10:38:09 |
| 12 | or whatever the exact date might be? | 10:38:15 |
| 13 | MR. HENDERSON:  And, Marty, for the | 10:38:18 |
| 14 | record we're going to object to the extent it | 10:38:19 |
| 15 | requires a legal opinion on any of the documents | 10:38:22 |
| 16 | that have been provided. | 10:38:23 |
| 17 | MR. QUINONES:  Understood. | 10:38:24 |
| 18 | A.  We provided all the documents that we | 10:38:26 |
| 19 | have.  As far as legal interpretation, I mean, | 10:38:28 |
| 20 | that's a legal opinion.  I don't have one on that. | 10:38:32 |
| 21 | BY MR. QUINONES: | 10:38:35 |
| 22 | Q.  That's fine.  And I'll ask you, you may | 10:38:35 |
| 23 | not be able to answer this, but does Rheem | 10:38:39 |
| 24 | contest -- strike that. | 10:38:47 |
| 25 | Yeah, I will ask it that way.  Does Rheem | 10:38:53 |

Transcript of Anthony Krell, Corporate Designee
Conducted on July 11, 2019                                    29

| | | |
|---|---|---|
| 1 | A.  It was, yes. | 10:35:57 |
| 2 | Q.  All right, great.  Okay.  So let's turn | 10:35:59 |
| 3 | to the second page, which is -- | 10:36:14 |
| 4 | MR. QUINONES:  And, I'm sorry, for those | 10:36:16 |
| 5 | on the phone, this exhibit is Bates numbered RHEEM | 10:36:17 |
| 6 | 00015 through 17. | 10:36:20 |
| 7 | BY MR. QUINONES: | 10:36:20 |
| 8 | Q.  So I want to turn to the second page, | 10:36:23 |
| 9 | which is RHEEM 00016, and then look down at the | 10:36:25 |
| 10 | bottom of the page, there's some handwritten | 10:36:32 |
| 11 | notations.  And I'll read you what I believe it | 10:36:40 |
| 12 | says.  It appears to say in the second to last | 10:36:45 |
| 13 | line, Orendorff Manufacturing Company, and then | 10:36:49 |
| 14 | there's an arrow and it appears to say, merged | 10:36:55 |
| 15 | into Rheem, and then there's a notation that I | 10:36:57 |
| 16 | can't quite read, and then it appears to say close | 10:37:01 |
| 17 | of business 12/31/66.  Is that how you read the | 10:37:04 |
| 18 | document as well? | 10:37:08 |
| 19 | A.  Yes, it is. | 10:37:09 |
| 20 | Q.  And there are some other documents | 10:37:12 |
| 21 | related to this that I think we'll talk about. | 10:37:14 |
| 22 | But is it your understanding that Orendorff | 10:37:16 |
| 23 | Manufacturing Company merged into Rheem at the | 10:37:21 |
| 24 | close of business 12/31/1966? | 10:37:23 |
| 25 | A.  That's my understanding, that Orendorff | 10:37:28 |

Transcript of Anthony Krell, Corporate Designee
Conducted on July 11, 2019                                    27

| | | |
|---|---|---|
| 1 | A.  Yes. | 10:32:24 |
| 2 | Q.  So what is Rheem's understanding of its | 10:32:25 |
| 3 | acquisition of any assets or liabilities that | 10:32:33 |
| 4 | belonged to Orendorff Manufacturing Company? | 10:32:37 |
| 5 | A.  I mean, Orendorff Manufacturing Company | 10:32:41 |
| 6 | was the company that Rheem owned in the fifties, | 10:32:45 |
| 7 | sixties, I think up until 1972, and then that | 10:32:51 |
| 8 | eventually was sold off to Opal, I think in 1972, | 10:32:56 |
| 9 | around that time. | 10:33:04 |
| 10 | Q.  Okay.  All right.  So then I want to | 10:33:18 |
| 11 | introduce document, Exhibit Number 51, I believe | 10:33:33 |
| 12 | we're at. | 10:33:39 |
| 13 | (Plaintiffs' Exhibit 51 marked) | 10:33:49 |
| 14 | BY MR. QUINONES: | 10:33:52 |
| 15 | Q.  And you can take a look that and let me | 10:33:52 |
| 16 | know when you're ready to talk about it. | 10:33:54 |
| 17 | A.  Okay. | 10:34:10 |
| 18 | Q.  Okay.  So have you seen this document | 10:34:19 |
| 19 | before? | 10:34:23 |
| 20 | A.  I have. | 10:34:23 |
| 21 | Q.  Can you tell me what it is in your | 10:34:25 |
| 22 | understanding. | 10:34:27 |
| 23 | A.  My understanding, it's just a list of | 10:34:30 |
| 24 | historical records of companies that Rheem's | 10:34:35 |
| 25 | acquired and some plant closures and when those | 10:34:37 |

Transcript of Anthony Krell, Corporate Designee
Conducted on July 11, 2019                                    38

```
 1        Q.   Okay.  But this was a document that,          10:52:30
 2   again, was pulled from either the scanned archives      10:52:34
 3   that we talked about or from Iron Mountain.             10:52:36
 4        A.   That's correct.                               10:52:39
 5        Q.   All right.  So let's turn to the second       10:52:39
 6   page of it that's Rheem 000009.  So then on the         10:52:42
 7   right side of the page there's a list with the          10:52:58
 8   header, Historical sketch of Rheem.  So I want to       10:53:01
 9   look down towards the bottom of the page, there         10:53:05
10   are two what appear to be hand notations where          10:53:08
11   there's a vertical line on the right side of the        10:53:11
12   page and a checkmark.  Do you know who made those       10:53:14
13   notations?                                              10:53:17
14        A.   I do not, no.                                 10:53:18
15        Q.   Do you know when they were made?              10:53:20
16        A.   No, I don't.                                  10:53:21
17        Q.   Okay.  So let's look at the top one --        10:53:22
18   excuse me, the top hand notation there appears to       10:53:28
19   be next to a line that reads:  1954, Rheem              10:53:34
20   purchases U.S. Spring and Bumper Company and forms      10:53:39
21   automotive division.                                    10:53:42
22             Is it Rheem's understanding today that        10:53:44
23   that's the year they purchased U.S. Spring and          10:53:47
24   Bumper Company?                                         10:53:51
25        A.   Yes, that's what my understanding is.         10:53:51
```

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

Transcript of Anthony Krell, Corporate Designee
Conducted on July 11, 2019                    44

| | | |
|---|---|---|
| 1 | one that the name -- but it didn't show up | 11:02:42 |
| 2 | anything on the pension or records. | 11:02:48 |
| 3 | Q. Okay. Has Rheem identified any | 11:02:49 |
| 4 | individuals other than Mr. Orendorff we talked | 11:02:51 |
| 5 | about who worked at either of the properties that | 11:02:54 |
| 6 | we've talked about, 4900 South Boyle Avenue or | 11:03:03 |
| 7 | 4910 South Boyle in Vernon? | 11:03:08 |
| 8 | A. We have not. | 11:03:11 |
| 9 | Q. Does Rheem know if during the period that | 11:03:22 |
| 10 | it occupied the properties we're talking about, | 11:03:24 |
| 11 | would there have been individuals with | 11:03:28 |
| 12 | responsibility over inspecting environmental | 11:03:33 |
| 13 | conditions at the properties? | 11:03:35 |
| 14 | A. I mean, we provided all the documents we | 11:03:39 |
| 15 | have, and we haven't found any names or -- that | 11:03:41 |
| 16 | would be related to that or part of that request, | 11:03:45 |
| 17 | so, I mean, you have everything that we have. | 11:03:49 |
| 18 | Q. Okay. Fair enough. Does Rheem know, | 11:03:52 |
| 19 | would it have been typical during that time for | 11:04:02 |
| 20 | there to be people with responsibility at a plant | 11:04:04 |
| 21 | for managing or inspecting environmental | 11:04:07 |
| 22 | conditions? | 11:04:11 |
| 23 | A. I don't know in the fifties and sixties | 11:04:12 |
| 24 | what their practices were. I don't know, I can't | 11:04:16 |
| 25 | answer that. | 11:04:18 |

Transcript of Anthony Krell, Corporate Designee
Conducted on July 11, 2019                        50

| | | |
|---|---|---|
| 1 | Insurance and Trust Company, Los Angeles, | 11:12:00 |
| 2 | California.  Does Rheem have a copy of that title | 11:12:03 |
| 3 | report? | 11:12:05 |
| 4 | A.  No, unless it was part of the documents | 11:12:08 |
| 5 | we produced, I don't remember seeing it.  But we | 11:12:11 |
| 6 | would not have it if it's not been produced. | 11:12:14 |
| 7 | Q.  Okay.  So let's turn to what's page 3 of | 11:12:17 |
| 8 | the document Bates numbered Rheem 00104.  And 3A | 11:12:25 |
| 9 | says -- I'll read 3A, which is titled assignment | 11:12:40 |
| 10 | of leases.  Concurrently with the execution of | 11:12:45 |
| 11 | this agreement, seller shall execute an assignment | 11:12:47 |
| 12 | of all leases of buildings situated on said | 11:12:50 |
| 13 | industrial tract in the exact form and substance | 11:12:53 |
| 14 | as more fully set forth in Exhibit B attached | 11:12:56 |
| 15 | hereto and incorporated herein by reference to be | 11:13:00 |
| 16 | effective as of the date of close of escrow.  Did | 11:13:03 |
| 17 | I read that correctly? | 11:13:06 |
| 18 | A.  Yes. | 11:13:07 |
| 19 | Q.  Does Rheem have an understanding of who | 11:13:11 |
| 20 | the lessees under the leases described here were? | 11:13:11 |
| 21 | A.  No, I don't recall seeing that. | 11:13:18 |
| 22 | Q.  And so I believe there's no Exhibit B | 11:13:22 |
| 23 | attached to this document that was produced in | 11:13:27 |
| 24 | discovery.  Does Rheem have a copy of Exhibit B | 11:13:32 |
| 25 | that's described in that paragraph? | 11:13:38 |

Transcript of Anthony Krell, Corporate Designee
Conducted on July 11, 2019                          57

| | | |
|---|---|---|
| 1 | there.  But I don't know when they started. | 11:34:18 |
| 2 | Q.  Okay.  Does Rheem have any information | 11:34:22 |
| 3 | about what Orendorff was doing other than that | 11:34:26 |
| 4 | they manufactured farm equipment? | 11:34:29 |
| 5 | A.  No, that's all we have. | 11:34:31 |
| 6 | Q.  Did Orendorff continue manufacturing farm | 11:34:33 |
| 7 | equipment after it merged with Rheem? | 11:34:38 |
| 8 | A.  Yes, they continued that business. | 11:34:41 |
| 9 | Q.  Okay.  And that was true until it was | 11:34:43 |
| 10 | sold to Opal? | 11:34:45 |
| 11 | A.  Yes, that's correct, in 1972. | 11:34:48 |
| 12 | Q.  Okay.  Does Rheem know how many employees | 11:34:51 |
| 13 | Orendorff had at the Vernon facility? | 11:34:59 |
| 14 | A.  No. | 11:35:02 |
| 15 | Q.  Does Rheem know how many employees it had | 11:35:04 |
| 16 | at the Vernon facility while it was manufacturing | 11:35:06 |
| 17 | there? | 11:35:08 |
| 18 | A.  I don't remember seeing that, no. | 11:35:09 |
| 19 | Q.  Okay.  Does Rheem have any documentation | 11:35:11 |
| 20 | of machinery that Orendorff operated at the 4900 | 11:35:17 |
| 21 | or 4910 properties? | 11:35:29 |
| 22 | A.  Again, that would have been kept at the | 11:35:30 |
| 23 | plant level.  We don't -- there was nothing that | 11:35:32 |
| 24 | we found related to equipment or lists in our | 11:35:35 |
| 25 | archives. | 11:35:39 |

Transcript of Anthony Krell, Corporate Designee
Conducted on July 11, 2019                                54

| | | |
|---|---|---|
| 1 | Q.  So does Rheem have a copy of any | 11:28:47 |
| 2 | inventory that was delivered pursuant to this | 11:28:51 |
| 3 | purchase and sale agreement? | 11:28:54 |
| 4 | A.  Again, we produced what we have.  We | 11:28:57 |
| 5 | don't have a list of equipment. | 11:29:00 |
| 6 | Q.  Okay.  So this paragraph describes what | 11:29:03 |
| 7 | it refers to as items installed by seller and | 11:29:22 |
| 8 | belonging to seller that were used at the | 11:29:24 |
| 9 | property.  Does Rheem have any reason to dispute | 11:29:30 |
| 10 | that property meeting the description in this | 11:29:33 |
| 11 | paragraph was present on the 14-acre property that | 11:29:38 |
| 12 | we've talked about? | 11:29:43 |
| 13 | A.  No.  Again, I think the document speaks | 11:29:44 |
| 14 | for itself, what's in there. | 11:29:46 |
| 15 | Q.  Okay.  And so I assume when it refers to | 11:29:48 |
| 16 | machinery, apparatus and other equipment, Rheem | 11:29:53 |
| 17 | doesn't know what that machinery, apparatus and | 11:29:58 |
| 18 | equipment would refer to. | 11:30:01 |
| 19 | A.  That's correct. | 11:30:04 |
| 20 | Q.  Okay.  Let's go back to the exhibit that | 11:30:05 |
| 21 | we've marked as 51.  This was the acquisition | 11:30:17 |
| 22 | history.  So turn to the last page of it marked | 11:30:21 |
| 23 | Rheem 00017.  Then there's a list in the top left | 11:30:32 |
| 24 | that says, Plants closed, and fifth from the | 11:30:44 |
| 25 | bottom it says, Vernon, California and then next | 11:30:51 |

Transcript of Anthony Krell, Corporate Designee
Conducted on July 11, 2019                    67

| | | |
|---|---|---|
| 1 | operating there? | 11:50:45 |
| 2 | A.  Again, that would be the same answer.  We | 11:50:45 |
| 3 | don't know. | 11:50:49 |
| 4 | Q.  All right.  And so I'll put it this way. | 11:50:49 |
| 5 | Other than what's been produced in the documents | 11:50:58 |
| 6 | that were produced by other parties that you | 11:51:01 |
| 7 | referred to that you reviewed, does Rheem have any | 11:51:03 |
| 8 | information about any construction, demolition, | 11:51:05 |
| 9 | installation of equipment, anything like that, at | 11:51:10 |
| 10 | the properties during the time it operated there? | 11:51:12 |
| 11 | A.  No, we don't. | 11:51:14 |
| 12 | Q.  All right.  Let's turn to page 8 of | 11:51:15 |
| 13 | Exhibit 49.  Topic number 9 is, Any regulatory or | 11:51:35 |
| 14 | administrative permitting process you undertook to | 11:51:49 |
| 15 | allow activities at the property.  Does Rheem have | 11:51:51 |
| 16 | any information about permits for construction or | 11:51:59 |
| 17 | operating machinery or anything during the time | 11:52:04 |
| 18 | period it was operating at 4900 or 4910 South | 11:52:07 |
| 19 | Boyle Avenue? | 11:52:11 |
| 20 | A.  Yeah, Rheem doesn't have anything.  We | 11:52:11 |
| 21 | produced what we have.  I don't know -- there | 11:52:14 |
| 22 | may -- I don't remember if there were permits | 11:52:18 |
| 23 | related to this.  I remember maybe seeing some | 11:52:20 |
| 24 | others that maybe some others had produced.  But | 11:52:22 |
| 25 | Rheem didn't have anything. | 11:52:25 |

Transcript of Anthony Krell, Corporate Designee
Conducted on July 11, 2019                                    68

| | | |
|---|---|---|
| 1 | Q.   Okay.   Let's move on to topic 10, The | 11:52:26 |
| 2 | environmental condition of the property during and | 11:52:45 |
| 3 | after your tenancy, occupancy and operations at | 11:52:48 |
| 4 | the property.  Did I read that correctly? | 11:52:52 |
| 5 | A.   Yes. | 11:52:54 |
| 6 | Q.   So does Rheem have any understanding of | 11:53:00 |
| 7 | the environmental condition of the property at the | 11:53:03 |
| 8 | time that it operated there? | 11:53:05 |
| 9 | A.   I mean, that would have been controlled | 11:53:09 |
| 10 | by the plant at that time, and we have no records | 11:53:11 |
| 11 | of the environmental condition or what -- what | 11:53:15 |
| 12 | happened during the timeframe we owned it. | 11:53:20 |
| 13 | Q.   Let me ask a question.  You've said a | 11:53:22 |
| 14 | couple of times that environmental matters would | 11:53:27 |
| 15 | have been handled at the plant level.  It's your | 11:53:31 |
| 16 | understanding that that would have been true in | 11:53:34 |
| 17 | the fifties and sixties as well? | 11:53:36 |
| 18 | A.   I would think so.  I mean, that's | 11:53:38 |
| 19 | typically where it would be handled, because they | 11:53:40 |
| 20 | know their processes and what's coming in and out | 11:53:45 |
| 21 | of there. | 11:53:47 |
| 22 | Q.   And so what's the basis for your | 11:53:48 |
| 23 | understanding there? | 11:53:51 |
| 24 | A.   I mean, just being in manufacturing for | 11:53:53 |
| 25 | the last 25 years.  That's pretty typical.  I | 11:53:57 |

Transcript of Anthony Krell, Corporate Designee
Conducted on July 11, 2019                                    57

1    there.  But I don't know when they started.          11:34:18

2         Q.  Okay.  Does Rheem have any information       11:34:22

3    about what Orendorff was doing other than that        11:34:26

4    they manufactured farm equipment?                     11:34:29

5         A.  No, that's all we have.                      11:34:31

6         Q.  Did Orendorff continue manufacturing farm    11:34:33

7    equipment after it merged with Rheem?                 11:34:38

8         A.  Yes, they continued that business.           11:34:41

9         Q.  Okay.  And that was true until it was        11:34:43

10   sold to Opal?                                         11:34:45

11        A.  Yes, that's correct, in 1972.                11:34:48

12        Q.  Okay.  Does Rheem know how many employees    11:34:51

13   Orendorff had at the Vernon facility?                 11:34:59

14        A.  No.                                          11:35:02

15        Q.  Does Rheem know how many employees it had    11:35:04

16   at the Vernon facility while it was manufacturing     11:35:06

17   there?                                                11:35:08

18        A.  I don't remember seeing that, no.            11:35:09

19        Q.  Okay.  Does Rheem have any documentation     11:35:11

20   of machinery that Orendorff operated at the 4900      11:35:17

21   or 4910 properties?                                   11:35:29

22        A.  Again, that would have been kept at the      11:35:30

23   plant level.  We don't -- there was nothing that      11:35:32

24   we found related to equipment or lists in our         11:35:35

25   archives.                                             11:35:39

Transcript of Anthony Krell, Corporate Designee
Conducted on July 11, 2019                                    63

| | | |
|---|---|---|
| 1 | Q.   Okay.  And similar to my previous | 11:44:16 |
| 2 | question, there's no one within Rheem who would | 11:44:21 |
| 3 | have a superior knowledge about that topic than | 11:44:26 |
| 4 | you sitting here today? | 11:44:29 |
| 5 | A.   That's correct. | 11:44:30 |
| 6 | Q.   All right.  So then let's look at topic | 11:44:31 |
| 7 | 6, Your actual handling and/or disposal of | 11:44:44 |
| 8 | chlorinated solvents, including but not limited to | 11:44:48 |
| 9 | PCE, TCE, 1,1-DCA, 1,1-DCE and 1,1-TCA at the | 11:44:51 |
| 10 | property.  Did I read that correctly? | 11:44:59 |
| 11 | A.   Yes. | 11:45:02 |
| 12 | Q.   So does Rheem have any understanding of | 11:45:03 |
| 13 | whether it handled or disposed of any of those | 11:45:07 |
| 14 | chlorinated solvents during the time it was | 11:45:12 |
| 15 | operating at the property? | 11:45:15 |
| 16 | A.   Again, the documents we produced had no | 11:45:17 |
| 17 | mention of the -- or that we found that related to | 11:45:22 |
| 18 | these chemicals, so everything we've found we've | 11:45:27 |
| 19 | produced.  We have no -- no -- no understanding if | 11:45:31 |
| 20 | these chemicals were there or used. | 11:45:41 |
| 21 | Q.   Okay.  So Rheem -- just to crystallize | 11:45:42 |
| 22 | that last thing you said, so Rheem has no | 11:45:46 |
| 23 | understanding one way or the other of whether it | 11:45:49 |
| 24 | used any of the chlorinated solvents referenced in | 11:45:52 |
| 25 | this question at the property. | 11:45:55 |

Transcript of Anthony Krell, Corporate Designee
Conducted on July 11, 2019                          74

```
1    as a new plant during this search.  Again, we were          12:10:54
2    focused on the Vernon facility.                             12:10:56
3        Q.  Okay.  So just to narrow it, sitting here           12:10:59
4    today, you as Rheem's representative just don't             12:11:10
5    have any information about whether chlorinated              12:11:19
6    solvents were used in Rheem's automotive                    12:11:22
7    manufacturing at Fullerton.                                 12:11:24
8        A.  That's correct.                                     12:11:27
9        Q.  Okay.  And does Rheem have any                      12:11:27
10   information about whether Orendorff Manufacturing           12:11:57
11   Company used chlorinated solvents in any of its            12:12:05
12   operations at the 4900 and 4910 South Boyle Avenue          12:12:06
13   property?                                                   12:12:10
14       A.  Again, it's going to be the same answer.           12:12:11
15   We reviewed the documents and nothing came up for          12:12:13
16   Orendorff or U.S. Spring and Bumper on the Vernon          12:12:17
17   site as far as chemicals that were used, so               12:12:20
18   there's no information on that.                            12:12:24
19       Q.  All right.                                         12:12:31
20       MR. QUINONES:  I am finished with any                  12:12:35
21   questions, so I think I will hand it over to Doug          12:12:37
22   first if he has any questions for the witness.            12:12:39
23       MR. HENDERSON:  We have no questions for               12:12:42
24   the witness.                                               12:12:44
25       MR. QUINONES:  On the phone, does anyone               12:12:46
```

Transcript of Anthony Krell, Corporate Designee
Conducted on July 11, 2019                            73

| | | |
|---|---|---|
| 1 | MR. HENDERSON:  Object to the form of | 12:09:30 |
| 2 | that question.  You mean at this time? | 12:09:31 |
| 3 | BY MR. QUINONES: | 12:09:36 |
| 4 | Q.  Well, yeah, I'll ask about this site | 12:09:37 |
| 5 | first.  So let me ask that again.  Does Rheem have | 12:09:39 |
| 6 | any understanding of whether it used chlorinated | 12:09:44 |
| 7 | solvents in its automotive manufacturing at the | 12:09:47 |
| 8 | 4900 or 4910 property at any time? | 12:09:50 |
| 9 | A.  The documents I reviewed and we've | 12:09:55 |
| 10 | produced, there's no mention of chemicals used at | 12:09:58 |
| 11 | the site, so there's -- there's no information on | 12:10:00 |
| 12 | that. | 12:10:04 |
| 13 | Q.  Okay.  And then I'll broaden it.  Does | 12:10:05 |
| 14 | Rheem have any understanding of whether it used | 12:10:08 |
| 15 | chlorinated solvents in its manufacturing in its | 12:10:12 |
| 16 | automotive division manufacturing at the Fullerton | 12:10:16 |
| 17 | site? | 12:10:20 |
| 18 | A.  Again, I -- we were focused on the Vernon | 12:10:22 |
| 19 | site.  But nothing came up on the Fullerton site. | 12:10:27 |
| 20 | I don't know of anything related to chemicals | 12:10:33 |
| 21 | found for Fullerton. | 12:10:36 |
| 22 | Q.  Okay.  Do you know if Rheem looked for | 12:10:38 |
| 23 | documents related to the Fullerton site in | 12:10:44 |
| 24 | response to plaintiff's request for productions? | 12:10:46 |
| 25 | A.  I mean, the only thing, Fullerton came up | 12:10:50 |

Transcript of Anthony Krell, Corporate Designee
Conducted on July 11, 2019                                    64

| | | |
|---|---|---|
| 1 | A.  Again, everything we produced we've -- | 11:45:58 |
| 2 | you've got everything we produced, and it has | 11:46:01 |
| 3 | nothing that mentions these chemicals. | 11:46:03 |
| 4 | Q.  And that's the extent of the information | 11:46:07 |
| 5 | Rheem has. | 11:46:09 |
| 6 | A.  That's correct. | 11:46:10 |
| 7 | Q.  All right.  Is Rheem aware of any | 11:46:10 |
| 8 | government regulations that would have applied to | 11:46:20 |
| 9 | the handling of hazardous substances at the | 11:46:25 |
| 10 | property during the time it operated there? | 11:46:29 |
| 11 | A.  Again, that would have been a plant-level | 11:46:36 |
| 12 | thing, so I don't know if -- we have no | 11:46:39 |
| 13 | understanding what was going on at that -- during | 11:46:41 |
| 14 | that timeframe related to the chemicals. | 11:46:44 |
| 15 | Q.  Okay.  So let me ask, is it Rheem's | 11:46:56 |
| 16 | standard practice today to abide by all government | 11:47:00 |
| 17 | regulations regarding the handling and storage of | 11:47:03 |
| 18 | potentially hazards us chemicals in its | 11:47:07 |
| 19 | manufacturing? | 11:47:11 |
| 20 | A.  Yes, it is.  We have people at each plant | 11:47:12 |
| 21 | that are associated -- that have that | 11:47:14 |
| 22 | responsibility on the environmental side to make | 11:47:17 |
| 23 | sure we're meeting those responsibilities. | 11:47:20 |
| 24 | Q.  And does Rheem know whether that was the | 11:47:23 |
| 25 | case during the time it was operating in Vernon? | 11:47:25 |

Transcript of Anthony Krell, Corporate Designee
Conducted on July 11, 2019                               24

| | | |
|---|---|---|
| 1 | A.  Yes. | 10:26:34 |
| 2 | Q.  Okay.  Did the procedure, the document | 10:26:34 |
| 3 | search procedures that we've talked about so far, | 10:26:41 |
| 4 | does that apply to this request for production as | 10:26:43 |
| 5 | well? | 10:26:45 |
| 6 | A.  Yes, yeah.  We've searched for documents | 10:26:49 |
| 7 | and we've provided everything that Rheem has. | 10:26:51 |
| 8 | Q.  Okay.  So since this response was | 10:26:53 |
| 9 | provided, Rheem hasn't identified any other | 10:26:59 |
| 10 | environmental conditions reports related to the | 10:27:04 |
| 11 | properties at issue in this litigation? | 10:27:05 |
| 12 | A.  That's correct. | 10:27:08 |
| 13 | Q.  Okay.  Does Rheem normally keep | 10:27:08 |
| 14 | environmental conditions reports or similar | 10:27:26 |
| 15 | documents for locations where it conducts | 10:27:28 |
| 16 | manufacturing? | 10:27:35 |
| 17 | A.  Yes.  I mean, they would keep reports for | 10:27:40 |
| 18 | locations.  I don't know the retention policy, but | 10:27:43 |
| 19 | we would have reports for today currently. | 10:27:46 |
| 20 | Q.  Okay.  Are those -- is there a database | 10:27:49 |
| 21 | where -- a single database where those are kept? | 10:27:59 |
| 22 | A.  I'm not aware of a database.  The | 10:28:05 |
| 23 | environmental, all that's handled by each plant | 10:28:08 |
| 24 | and each facility, so they have people at those | 10:28:12 |
| 25 | facilities that would manage that.  I don't know | 10:28:18 |

Transcript of Anthony Krell, Corporate Designee
Conducted on July 11, 2019                           59

| | | |
|---|---|---|
| 1 | A.  No, I didn't look into that.  I wouldn't | 11:37:16 |
| 2 | expect to find anything.  But I didn't see | 11:37:18 |
| 3 | anything related to that. | 11:37:20 |
| 4 | Q.  Okay.  Okay.  So does Rheem know whether | 11:37:21 |
| 5 | it operated any vapor degreasers at the Vernon | 11:37:33 |
| 6 | facility? | 11:37:38 |
| 7 | A.  Again, the documents we produced didn't | 11:37:40 |
| 8 | mention anything about vapor degreasers.  So | 11:37:45 |
| 9 | that's all the information that we have. | 11:37:47 |
| 10 | Q.  Okay.  And just so that we're clear, your | 11:37:48 |
| 11 | understanding of what vapor degreasing means? | 11:37:50 |
| 12 | A.  I understand a little bit, yeah.  I don't | 11:37:53 |
| 13 | know -- I'm not that familiar with the equipment, | 11:37:56 |
| 14 | but I've heard the term in the past. | 11:37:58 |
| 15 | Q.  Okay. | 11:38:00 |
| 16 | A.  Or degreaser.  I don't know if I heard | 11:38:01 |
| 17 | the vapor portion.  I've heard degreaser, so . . . | 11:38:04 |
| 18 | Q.  Okay.  So to put a bow on it, does -- | 11:38:07 |
| 19 | actually, I'll come back to that later. | 11:38:22 |
| 20 | So other than the information that's in | 11:38:32 |
| 21 | the documents that you've produced, is there | 11:38:34 |
| 22 | anyone, current or former employees of Rheem, who | 11:38:35 |
| 23 | would have superior knowledge that you're aware of | 11:38:41 |
| 24 | regarding whether any vapor degreasers were | 11:38:44 |
| 25 | operated at the Vernon facility? | 11:38:47 |

Transcript of Anthony Krell, Corporate Designee
Conducted on July 11, 2019                                    66

| | | |
|---|---|---|
| 1 | the property during its tenancy? | 11:49:12 |
| 2 | A.  I don't know that they did or not. | 11:49:15 |
| 3 | Q.  Okay.  Do you know if they removed any | 11:49:17 |
| 4 | underground storage tanks? | 11:49:19 |
| 5 | A.  No, I do not. | 11:49:20 |
| 6 | Q.  And we've talked about this, I believe, | 11:49:21 |
| 7 | but does Rheem know if it installed any vapor | 11:49:23 |
| 8 | degreasers at the property at any time? | 11:49:27 |
| 9 | A.  Again, in the documents we produced we | 11:49:30 |
| 10 | found nothing related to degreasers, so it was -- | 11:49:32 |
| 11 | we have no information on that. | 11:49:37 |
| 12 | Q.  Okay.  And the same is true of removing | 11:49:38 |
| 13 | vapor degreasers? | 11:49:41 |
| 14 | A.  That's correct. | 11:49:43 |
| 15 | Q.  Does Rheem know if it installed or | 11:49:46 |
| 16 | removed any metal plating equipment at the 4900 or | 11:49:49 |
| 17 | 4910 properties? | 11:49:55 |
| 18 | A.  Again, yeah, we don't know. | 11:49:57 |
| 19 | Q.  Okay.  Does Rheem know if it altered the | 11:49:58 |
| 20 | sewer lines at the property at any time? | 11:50:08 |
| 21 | A.  Again, if it's not in the documents then | 11:50:18 |
| 22 | we don't know what happened during that timeframe. | 11:50:22 |
| 23 | Q.  All right.  Same for demolishing any | 11:50:25 |
| 24 | structures.  Does Rheem know if it demolished | 11:50:39 |
| 25 | anything on 4900 or 4910 during the time it was | 11:50:42 |

Transcript of Anthony Krell, Corporate Designee
Conducted on July 11, 2019                    69

| | | |
|---|---|---|
| 1 | don't know if it was in the 1950s or sixties.  It | 11:54:02 |
| 2 | is today for Rheem, anyway, that that be done by | 11:54:05 |
| 3 | the plant. | 11:54:11 |
| 4 | Q.  Okay.  And so I take it Rheem hasn't | 11:54:11 |
| 5 | found any reports or analyses or data concerning | 11:54:17 |
| 6 | environmental conditions at the property from the | 11:54:25 |
| 7 | 1950s or sixties? | 11:54:27 |
| 8 | A.  That's correct. | 11:54:29 |
| 9 | Q.  And Rheem hasn't found any documentation | 11:54:31 |
| 10 | or any other information concerning any spills or | 11:54:34 |
| 11 | releases of chemicals at the property during the | 11:54:39 |
| 12 | time it owned it? | 11:54:42 |
| 13 | A.  No, we have not. | 11:54:43 |
| 14 | Q.  Okay.  Does Rheem know if it performed | 11:54:44 |
| 15 | any investigation or due diligence concerning the | 11:54:54 |
| 16 | condition of the property at the time that it | 11:55:01 |
| 17 | purchased it? | 11:55:02 |
| 18 | A.  No, we do not. | 11:55:04 |
| 19 | Q.  So you don't have any records about that? | 11:55:05 |
| 20 | A.  There's no records. | 11:55:07 |
| 21 | Q.  And does Rheem know if anyone else did | 11:55:13 |
| 22 | that on its behalf at the time that it purchased | 11:55:16 |
| 23 | the property? | 11:55:18 |
| 24 | A.  No.  I mean, we produced what we have.  I | 11:55:20 |
| 25 | don't know of any other documents that -- related | 11:55:23 |